743 A.2d 431

**In re Richard D. CICCHETTI, Former Judge and President Judge Court of Common Pleas Fourteenth Judicial District Fayette County.**

**Appeal of Judicial Conduct Board (at 0092 MDA97).**

**Appeal of Richard D. Cicchetti (at 93MDA97).**

Supreme Court of Pennsylvania.

Argued Nov. 18, 1998.

Decided Jan. 13, 2000.

Vincent J. Quinn, Chief Counsel, Gregory D. Anthony, Deputy Counsel, for Judicial Conduct Bd.

Joseph W. Selep, Dara A. DeCourcy, Pittsburgh, for Richard D. Cicchetti.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

The Judicial Conduct Board (the Board) appeals from an Order of the Court of Judicial Discipline (the court), which held that Former Judge Richard D. Cicchetti (Appellee) brought disrepute to the judicial office and violated the Election Code, 25 P.S. § 3249. Appellee filed a cross-appeal of the same Order.

## FACTS

Appellee served as a Judge of the Court of Common Pleas for the Fourteenth Judicial District of Pennsylvania, Fayette County, from January of 1974 to December 31, 1995, when he

retired from judicial service. He was President Judge from January of 1978 until his retirement. In his capacity as President Judge, Appellee supervised all court employees of the Fayette County Court of Common Pleas. This supervisory authority applied to court reporters and the employees of the Adult Probation and Parole Office.

The Board filed a three-part Complaint against Appellee: Part A consists of allegations of sexual misconduct; Part B alleges violation of prohibition against court-appointed employees engaging in partisan political activity with regard to Appellee's judicial retention election; and Part C alleges that Appellee filed false affidavits with two campaign expense reports in violation of the Election Code, thereby violating the Pennsylvania Constitution.

## PART A

Regarding Part A, the Court of Judicial Discipline made the following findings of fact:

(i) Debra Hay

7. Debra Hay was a party to a divorce action before [Appellee] in 1975. She never had any contact with him before or after that litigation.

8. Debra Hay appeared before [Appellee] in one brief proceeding conducted on January 30, 1976.

9. The conduct of [Appellee] about which Debra Hay complained and testified, i.e., sexually explicit remarks made over the telephone on eight to ten occasions by someone who "identified himself as Judge Richard Cicchetti" is alleged to have taken place in the three month period between December, 1975 and March, 1976, when the divorce litigation ended.

(ii) Mary Beth Hostert

10. On January 4, 1982 Mary Beth Hostert became a member of the Pennsylvania State Police and, thereafter, she undertook and completed a five month training period and a 60 day "coaching" period while assigned to the State Police Barracks in Uniontown, Fayette County.

11. Sometime shortly after the completion of the coaching period she appeared before [Appellee] as a witness in a case. She does not remember whether this appearance was in 1982 or 1983, nor the name of the defendant, the name of the assistant district attorney, the name of the defense lawyer, the docket number, the disposition of the case or whether it was civil or criminal.

12. She never had any contact with [Appellee] either before or after this one occasion.

13. She left her employment with the State Police in 1990.

14. She testified that in late 1982 or early 1983, during a ten minute conversation in [Appellee]'s robing room consisting of "basically just small talk", [Appellee] inquired as to whether she would like to go with him to visit her parents' country home in Ligonier or to Seven Springs resort for a weekend.

(iii) Krista Miller

15. Krista Miller was employed as a court reporter by the Fayette County Court of Common Pleas from early 1991 until June 15, 1993. During that time, she worked for Judge Wagner of that Court. By letter dated June 15, 1993, Judge Wagner terminated that employment for reasons relating to the performance of the duties of her job.

16. The Board's Complaint avers that in late 1991 or early 1992 Ms. Miller and other court reporters attended a meeting with [Appellee] to enlist [Appellee]'s support for computerization of the court reporters' equipment and that, at this meeting, [Appellee] inquired "what's in it for me?" to the assembled court reporters, whereupon, responding, Ms. Miller jokingly said that, if [Appellee] would support their request, she and the others would buy [Appellee] dinner. The Complaint then avers that later that day [Appellee] called Ms. Miller in Judge Wagner's office asking if she was serious about having dinner with him.

17. At the trial Ms. Miller testified that she didn't know whether the meeting with [Appellee] took place in late 1991/early 1992 or in late 1992/early 1993 but, whenever it

was, she thereafter, over a period of six to nine months, received 15–20 telephone calls from [Appellee] while she was in her office [during] the course of some of which [Appellee] suggested they go out together.

18. During the period of her employment with Fayette County Ms. Miller had frequent, casual encounters with [Appellee] in and about the courthouse. On none of these occasions did [Appellee] suggest that Ms. Miller engage in a sexual relationship with him.

19. During the period of her employment with Fayette County and after the alleged meeting regarding computerization, Ms. Miller frequently called [Appellee]'s office or personally stopped in unannounced asking to see [Appellee]. These phone calls and visits had to do with both her courthouse duties and personal matters such as the apartment she was renting from [Appellee]'s son, detailing her car, and interviews she was having for a job in Philadelphia.

20. At no time did Ms. Miller report these phone calls or their content to Judge Wagner, to any of her fellow court reporters, or to any of her friends.

21. A few months before she left employment with Fayette County, Ms. Miller told Humphrey Lukachick, at the time Chief of County Detectives of Fayette County, that she had been receiving phone calls from [Appellee] asking her to go out. Ms. Miller did not tell Mr. Lukachick that [Appellee] ever made any sexual overtures to her or ever discussed anything of a sexual nature.

(iv) Heather Glover Brueggman

22. In July, 1993, Heather Glover Brueggman began employment with the Fayette County Adult Probation Office. This was her first full time job after her graduation from Penn State University.

23. In Fayette County, at the time, one probation officer was assigned each judge and Heather Glover Brueggman was assigned to [Appellee].

24. She remained on that assignment until February, 1994, when she resigned after only eight months of employment with [Appellee].

25. Her job required her to be in [Appellee]'s courtroom whenever he was hearing criminal cases.

26. [Appellee] repeatedly called Ms. Brueggman into his robing room adjacent to the courtroom and spoke to her about personal matters such as:

— what kind of car she drove

— what she liked to do on weekends

— whom she dated

— how many boyfriends she had

— if it was true blondes had more fun

— whether they could get together

27. On one of these occasions, while [Appellee] was showing Ms. Brueggman the stained glass windows in the courtroom, he put his arm around her and told her to think about getting together over the weekend. On the following Monday, [Appellee] called her and asked if she had thought about getting together and she told him she did not want to do that.

28. [Appellee] telephoned Ms. Brueggman frequently upon which occasions he:

— repeatedly importuned her to get together with him after giving her a weekend to think it over; and when she said "no",

— asked her if she knew how powerful he was and that he could get anybody in the county to do anything he wanted.

29. On one occasion [Appellee] invited Ms. Brueggman to his chambers for lunch at which time he remarked about her build, asked if she wanted to go to law school or become a magistrate and told her he could help her in either case.

30. [Appellee] proposed that he and Ms. Brueggman visit the home of Harry Fike, Fayette County Controller, who had a hot tub.

31. [Appellee] persistently endeavored to coerce Ms. Brueggman to engage in a sexual relationship with him and her persistent refusal to do so resulted in:

— [Appellee]'s making Ms. Brueggman's job performance difficult and then advising her that he could change things if she agreed to get together;

— [Appellee]'s statement to Ms. Brueggman that he could have her father fired from his job with PennDot, and his intimation that he would do so unless she agreed to get together.

32. Ms. Brueggman's father was employed by PennDot at the time.

33. Shortly after Ms. Brueggman commenced working for [Appellee] she started reporting to her fiancee (now husband) that [Appellee] was calling her and asking her to get together with him. She reported this to her fiancée on numerous occasions.

34. On the first Monday of hunting season in 1993, Ms. Brueggman told her father of [Appellee]'s repeated suggestions to her and that she was being harassed.

35. Ms. Brueggman's father then complained to Fayette County Controller, Fike, about the treatment his daughter was receiving from [Appellee].

36. Joseph Guynn was employed by the Fayette County Adult Probation Office from June 27, 1993 to June 27, 1995 and shared an office with Heather Brueggman while she was employed by the County, i.e., from July, 1993 until February, 1994.

37. Mr. Guynn was present in the office many times when Ms. Brueggman received telephone calls from [Appellee] and she discussed the calls with him "pretty much daily". Mr. Guynn believed the phone calls appeared to make her nervous and that she did not want to receive them.

38. Joseph Semansky was also an employee in the Probation Office of Fayette County and occupied an office adjacent to the office of Ms. Brueggman.

39. Two or three months after Ms. Brueggman came to work in the office she told Mr. Semansky that [Appellee] put his arm around her when she was in court that morning and advised her that her job could be easy and she could possibly be appointed district justice, which conversation had made her uncomfortable.

40. On another occasion, Ms. Brueggman told Mr. Semansky that [Appellee] wanted her to join him in Harry Fike's hot tub and that she felt that her father's employment with PennDot was threatened if she refused the invitation. During this conversation the telephone rang and she visibly jumped, her face turned white and she said, "My God, I hope it's not him."

41. Ms. Brueggman also discussed [Appellee]'s conduct with Tim Fazenbaker, a fellow probation officer, Charles Hoone, her supervisor, and Larry Rosenberger, the Warden of the Fayette County Jail.

42. Ms. Brueggman reasonably regarded [Appellee]'s conduct as harassing, coercive, and threatening.

43. Ms. Brueggman resigned from her job because of [Appellee]'s harassment and threats.

*In re Richard D. Cicchetti,* 697 A.2d 297, 301–304 (Pa.Ct. of Judicial Discipline 1997).

Concerning these four women, the Board asserted that Appellee's actions constituted:

1. misconduct in office (Count 1);

2. conduct that prejudices the proper administration of justice (Count 2);

3. conduct that brings the judicial office into disrepute (Count 3);

4. a violation of Canon 1 of the Code of Judicial Conduct (Count 4);

5. a violation of Canon 2 of the Code of Judicial Conduct (Count 5);

6. a violation of Canon 3A(3) of the Code of Judicial Conduct (Count 6);

7. a violation of Canon 3A(4) of the Code of Judicial Conduct (Count 7);

8. a violation of Article V, § 17(b) of the Pennsylvania Constitution (Count 8).

Based on the findings of fact, the court held that the allegations relating to Ms. Hay and Ms. Hostert were prohibited by Rule 15 of the Judicial Conduct Board Rules of Procedure. Rule 15 prevents the Board from basing a complaint on allegations of conduct that occurred more than four years prior to the filing of the complaint. However, where the last episode of an alleged *pattern of conduct* occurred within the past four years, the Board may consider all prior related acts that form the pattern. Board Rule 15. The incidents relating to Ms. Hay and Ms. Hostert were too remote in time to form a pattern, therefore, the court held that the charges were void.

With respect to Ms. Miller, the court held that the Board failed to prove the charges by clear and convincing evidence because Ms. Miller's testimony was contradicted, Ms. Miller initiated frequent contact with Appellee, and her departure from her position with Judge Warner was unrelated to these incidents.

The court did find, however, that the Board proved by clear and convincing evidence that Appellee's conduct toward Ms. Brueggman was a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution because it brought the judicial office into disrepute. Notwithstanding, the court held that the conduct did not constitute "misconduct in office" in violation of Article V, § 18(d)(1); did not prejudice the proper administration of justice; did not violate Canons 1, 2, 3A(3) or 3A(4) of the Code of Judicial Conduct; nor did it violate Article V, § 17(b) of the Pennsylvania Constitution.

## PART B

In Part B, the court made the following findings of fact:

44. [Appellee] stood for retention as judge during the general election held on November 2, 1993.

45. [Appellee] formed a campaign committee in 1993 which was designated as the "Committee To Retain President Judge Richard D. Cicchetti" ("the Committee").

46. In 1993 Pandalyn Forrest served as court reporter for [Appellee].

47. In 1993 Roberta Meese was Deputy Court Administrator of Fayette County.

48. In 1993 Thomas McDowell was Chief Court Constable for Fayette County.

49. At the time of the retention election of 1993 Pandalyn Forrest, Roberta Meese, and Thomas McDowell were "court-appointed employees" as defined in the Guidelines Regarding Political Activity by Court–Appointed Employees, promulgated by Order of the Supreme Court of Pennsylvania dated June 29, 1987 and in effect during 1993.

50. At [Appellee]'s request, Pandalyn Forrest served as Treasurer of the Committee to Retain Richard D. Cicchetti.

51. Roberta Meese did not serve the Committee in any official capacity but did, at [Appellee]'s request, cash three checks drawn on the Committee's bank account in the aggregate amount of $1500 and deliver the cash to [Appellee].

52. Thomas McDowell did not serve the Committee in any official capacity but did, at [Appellee]'s request, endorse two checks payable to him drawn on the Committee's bank account in the aggregate amount of $1140.

53. McDowell does not remember cashing the checks or what he did with the cash, but he did not keep it.

54. The Supreme Court's Guidelines Regarding Political Activity by Court–Appointed Employees promulgated by Order of June 29, 1987 provide:

Guidelines Regarding Political Activity by Court–Appointed Employees

1. Definitions.

(a) **The term "partisan-political activity"** shall include but is not limited to, running for public office, serving as a party committee-person, working at a polling place on

Election Day, performing volunteer work in a political campaign, soliciting contributions for political campaigns, and soliciting contributions for a political action committee or organization, but **shall not include involvement in non-partisan** or public community organizations or professional groups.

\* \* \*

2. Prohibition on Partisan Political Activity.

**Court-appointed employees shall not be involved in any form of partisan political activity.**

\* \* \*

4. President Judge.

**The President Judge of each appellate court or county court of common pleas shall be responsible for the implementation of these guidelines and shall be subject to the review of the Judicial Inquiry and Review Board for failure to enforce.**

*In re Cicchetti,* 697 A.2d at 304–05 (emphasis added).

The Board charged Appellee with violating Section 4 of the Supreme Court Guidelines regarding Political Activity by Court–Appointed Employees (hereinafter "the Guidelines"), by failing to prohibit court-appointed employees from engaging in proscribed political activity. The court disagreed and concluded that retention elections are nonpartisan by their very nature. It reached this conclusion based on Article V, § 15(b) of the Pennsylvania Constitution, which provides:

If a justice or judge files a declaration [of candidacy for retention election] his name shall be submitted to the electors **without party designation,** on a separate judicial ballot or in a separate column on voting machines ... to determine only if he shall be retained in office.

(emphasis added). Accordingly, it held that the employees were not engaged in proscribed partisan political activity and Appellee did not fail to enforce the Guidelines.

Judge Magaro, joined by Judge Sweeney, filed a concurring and dissenting statement expressing his disagreement with

the court's conclusion that participation in a retention election is nonpartisan political activity. In this regard, he explained, "The reality is, at least in this Commonwealth, that judges are members of one or another political party. They are no less so when they stand for retention."

## PART C

The court made the following findings of fact concerning Part C of the Complaint:

56. Findings of Fact Nos. 44, 45 and 50–53 relate to the charges contained in PART C of the Board's Complaint (as well as to PART B) and are incorporated here.

57. On November 1, 1993 the Committee issued three checks: one in the amount of $600 payable to Roberta Meese, one in the amount of $500 payable to Jammie Gammon, and one in the amount of $400 payable to Ann Raymond—a total of $1500. Jamie Gammon is Roberta Meese's daughter and Ann Raymond is Roberta Meese's mother.

58. Roberta Meese cashed the checks and delivered the cash to [Appellee].

59. On November 22, 1993 the Committee filed a Campaign Expense Report with the Bureau of Commissions, Elections and Legislation of the Commonwealth of Pennsylvania for the period October 9, 1993 to November 17, 1993. (Board Exhibit 3)

60. On page 10 of the Report the Committee stated that Meese, Gammon and Raymond were paid the $1500 to reimburse them for the purchase of "Party Supplies".

61. That information was false inasmuch as Meese, Gammon and Raymond did not purchase party supplies and received no money from the Committee.

62. On October 20, 1993 the Committee issued a check in the amount of $600 payable to Thomas McDowell.

63. On page 10 of the Report the Committee stated that McDowell was paid $600 to reimburse him for the purchase of "Party Supplies".

64. That information was false inasmuch as McDowell did not purchase party supplies and in fact received no money from the Committee.

65. On January 7, 1994, the Committee issued a check in the amount of $540 payable to Thomas McDowell.

66. On January 13, 1994, the Committee filed a Campaign Expense Report with the Bureau of Commissions, Elections and Legislation of the Commonwealth of Pennsylvania for the period November 18, 1993 to January 10, 1994. (Board Exhibit 4)

67. On page 8 of the Report, the Committee reported that McDowell was paid $540 to reimburse him for "Transportation".

68. That information was false inasmuch as McDowell did not provide transportation and, in fact, received no money from the Committee.

69. [Appellee] executed the affidavit portion of these two Reports attesting that, to the best of his knowledge and belief, the Committee had not violated the Act of June 3, 1937 (P.L. 1333, No. 320) as amended.

70. At the time he executed the affidavits on these Reports, [Appellee] knew the above specified information relating to the payments to Meese, Gammon, Raymond and McDowell was false and that the execution of the false affidavits constituted a violation of the Act of June 3, 1937 (P.L. 1333, No. 320) as amended.

*In re Cicchetti*, 697 A.2d at 305–06. This conduct, the Board averred, subjected Appellee to discipline in accordance with Article V, § 18(d)(1) of the Pennsylvania Constitution because it amounted to:

1. misconduct in office (Count 17);
2. conduct that prejudices the proper administration of justice (Count 18);
3. conduct that brings the judicial office into disrepute (Count 19);
4. a violation of Canon 1 of the Code of Judicial Conduct (Count 20);

5. a violation of Canon 2 of the Code of Judicial Conduct (Count 21);

6. a violation of Article V, § 17(b) of the Pennsylvania Constitution because it is a violation of Canons 1 and 2 (Count 22);

7. a violation of Article V, § 17(b) of the Pennsylvania Constitution because it is a violation of the Crimes Code of Pennsylvania (18 Pa.C.S.A. § 4902 and § 4903) (Count 23);

8. a violation of Article V, § 17(b) of the Pennsylvania Constitution because it is a violation of the Election Code (25 P.S. § 3249) (Count 24);

9. a violation of Rules 8.4(b), (c), (d) and (e) of the Pennsylvania Rules of Professional Conduct (Count 25).

The court rejected each charge except Count 24. It found that the Board demonstrated by clear and convincing evidence that Appellee willingly submitted false, fraudulent or misleading statements in affidavits attached to two Campaign Expense Reports, therefore he violated Section 1629 of the Election Code, 25 Pa.C.S. § 3249. This conduct also constituted a violation of Article V, § 17(b) of the Pennsylvania Constitution as an activity prohibited by law.

## COURT OF JUDICIAL DISCIPLINE'S DECISION

Both the Board and Appellee filed objections to the court's findings and conclusions. After rejecting the objections, the court affirmed its Findings of Facts and Conclusions of Law, and entered a per curiam Order imposing a severe reprimand and censure on Appellee.

The Board filed a direct appeal to this Court, and Appellee filed a cross-appeal.

## ISSUES ON APPEAL

I. Did Appellee's conduct towards Ms. Brueggman violate Canons 1 and 2 of the Code of Judicial Conduct?

II. Did Appellee's conduct of using court-appointed employees to cash checks and return the fund to him so that he

could file false campaign expense reports violate Canons
1 and 2 of the Code of Judicial Conduct and bring the
judicial office into disrepute pursuant to Article V, § 18
of the Pennsylvania Constitution?

III. Did Appellee's solicitation of court-appointed employees
to assist him in his retention election campaign violate
Supreme Court Order dated June 29, 1987, 82 Admin.
Dkt. No. 1, and Canons 1, 2, and 3(B)(2) of the Code of
Judicial Conduct?

## ISSUES ON CROSS-APPEAL

I. Does the Board's prosecution of stale claims premised
on allegations of conduct so remote in time that the
court found that Appellee was deprived of due process,
warrant dismissal of the complaint, where the Board
pursued the claims on the bald assertion that is decision
to investigate and prosecute was not subject to judicial
review?

II. Did the court err in finding that Appellee made unwant-
ed sexual overtures toward Ms. Brueggman?

III. Did the court err in finding that the Board proved by
clear and convincing evidence that Appellee's conduct
toward Ms. Brueggman brought the judicial office into
disrepute?

IV. Did the court err in finding that the Board proved by
clear and convincing evidence, that Appellee's affidavit
was a "willfully false, fraudulent or misleading state-
ment" in violation of Section 1629 of the Election Code?

V. Was Appellee deprived of due process of law and im-
paired in the exercise of the right to confront witnesses
against him by the implementation of rules limiting
pretrial discovery in prosecution pursued by the Board?

## DISCUSSION

## STANDARD OF REVIEW

This Court's standard of review of decisions by the Court of
Judicial Discipline is set forth in the Pennsylvania Constitution
as follows:

▆▆▆▆▆▆▆▆▆▆▆▆

On appeal, the Supreme Court or special tribunal shall review the record of the proceedings of the court as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court or special tribunal may revise or reject an order of the court upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court or special tribunal shall affirm the order of the court.

Article V, § 18(c)(2).

## APPEAL ISSUE ONE

▆▆▆▆ The Board argues that Appellee's conduct against Ms. Brueggman violated Canons 1 and 2 of the Code of Judicial Conduct. Canons 1 and 2, respectively, provide:

CANON 1. A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY.

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

CANON 2. A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES.

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are

in a special position to influence him. He should not testify voluntarily as a character witness.

This Court has stated that "Canon 1 is primarily a statement of purpose and rule of construction, rather than a separate rule of conduct. It requires that each of the other Canons be construed in accordance with the Code's fundamental purpose of ensuring both the independence and the integrity of the judiciary." *In re Larsen,* 532 Pa. 326, 387, 616 A.2d 529, 558 (1992). The phrase "independence and integrity of the judiciary" as used in Canon 1 relates to a judicial officer's impartiality and independence in the judicial decision-making process. Although, admittedly, Appellee's conduct toward Ms. Brueggman was in appropriate for a member of the judiciary, it did not affect his impartiality or independence in the decision-making process.

Canon 2 similarly addresses the judicial decision-making process and seeks to avoid the appearance of influence over judicial activities. Appellee is not subject to censure for a violation of Canon 2 based on his conduct toward Ms. Brueggman because it was independent of his decision-making duties.

## APPEAL ISSUE TWO

Next, the Board asserts that Appellee's involvement in the check cashing activities outlined in Part B of the Complaint violated Canons 1 and 2 of the Code of Judicial Conduct and brought the Appellee's judicial office into disrepute. As explained above, these Canons refer to the independence and integrity of the judicial decision-making process, and as such, they are not implicated here. Although we do not condone Appellee's behavior, the court reached the correct decision by finding his conduct violated Article V, § 18(d)(1), but was not a violation of Canons 1 and 2.

## APPEAL ISSUE THREE

Appellee's solicitation of court-appointed employees to assist him in his retention election campaign, the Board contends, violated the Guidelines and Canons 1, 2, and 3(B)(2) of

the Code of Judicial Conduct. The underlying issue of the Board's third question on appeal is whether participation in a retention election campaign constitutes partisan or nonpartisan political activity.

The court here concluded that because Article V, § 15(d) of the Pennsylvania Constitution dictates that judicial retention candidates appear on the ballot without party designation, the retention election process is necessarily nonpartisan. The court noted that delegates to the Constitutional Convention of 1967–68 adopted the concept of the retention election to keep the judiciary out of partisan politics. The dissenting members of the court, however, opined that although the judges appear without party designations, retention elections, like all judicial elections, are partisan. They assert that organized opposition to a judge seeking retention is most likely to come ·from the political party that opposed the judge's initial election. Thus, since a particular party may advocate voting against a judicial retention candidate, the process becomes partisan.

The Board suggests that nonpartisan activity encompasses conduct that does not have any impact on the electoral process, such as "actions on referendums which do not implicate elected officials or political parties in any form .... [or] conduct which might be engaged in by the person to further the interests of the system at large by lobbying political officials for aid for the court system as a whole." Board's Brief at 22–23.

Appellee argues that given the fact that the Constitution states that retention elections shall be without party designation, this Court must have intended to insulate incumbent members of the judiciary from partisan political activity. He distinguishes judicial retention elections, in which the candidate declares *no political affiliation,* to the factual scenario presented in *In re Dobson,* 517 Pa. 19, 534 A.2d 460 (1987), where the candidates were supported by *both political parties.*

In *Dobson,* two of the petitioners were tipstaffs for judges of the Court of Common Pleas. Joseph Panucci was successful in the primary race for school board and became both the

Democratic and Republican candidate for a seat on the school board of the Sto–Rox School District in Allegheny County. Similarly, Gerald Matthews sought re-election to his position as a member of his local school board. Mr. Matthews also won both the Democratic and Republican primaries and became the candidate for both parties. Mr. Panucci and Mr. Matthews each argued that the pursuit of a position on the school board was a nonpartisan political activity that was not prohibited by this Court's Guidelines. They further contended that since they were the Republican *and* Democratic candidates, their attempt to become elected to the school board was nonpartisan.

This Court rejected those arguments in *Dobson,* holding that the fact that a candidate for elective school board directorship may place his or her name on the primary ballot of more than one political party does not render the activity nonpartisan. Then Chief Justice Nix stated, "[T]he fact that the legislature has provided for the nonpartisan selection of school board directors does not negate the fact that such a post, if elective, is still one which is obtained through the political process; nor is there any alteration of the reality that a person entering that process to obtain such an office is, by definition, engaged in political activity." *Dobson,* 517 Pa. at 27, 534 A.2d at 464. Appellee argues that the situation of an incumbent judge who stands for election differs significantly from that of a school board candidate who is nominated by both political parties. A judge seeking retention may not run as a representative of a party, and may not be opposed by any candidate. However, a school board candidate who receives party nominations and may face opposition from third-party candidates is clearly involved in partisan politics. We agree with the court that retention elections by judicial candidates do not meet the definition of "partisan political activity," and accordingly, we affirm its decision that the Board did not establish the charges set forth in Counts 9 through 16.

Nevertheless, we recognize that permitting court-appointed employees to participate in the retention election campaigns of judicial officers may create the appearance of impropriety.

This Court has held that the prohibition against partisan political activity is to "maintain not only the independence, integrity and impartiality of the judicial system but also the appearance of these qualities." *Dobson,* 517 Pa. at 29, 534 A.2d at 465, *citing, In re Prohibition of Political Activities by Court-Appointed Employees,* 473 Pa. 554, 560, 375 A.2d 1257, 1259 (1977). We believe that this goal, which is fundamental to public confidence in the judiciary, can best be met by extending the prohibition against political activity to judicial retention elections. Accordingly, court-appointed employees may no longer participate in judicial retention election campaigns.

## CROSS–APPEAL ISSUE ONE

■ In his cross-appeal, Appellee first argues that his due process rights were violated when the Board pursued stale claims against him, and that this violation warrants a dismissal of the entire complaint.[1] Appellee moved to dismiss the complaint for deprivation of due process and the Board's violation of its own Rule 15 that prohibits bringing a complaint based on events that are more than four years old. The court dismissed the charges filed against Appellee that stemmed from allegations involving Ms. Hay and Ms. Hostert, which were premised on events that allegedly occurred in 1976, and 1982 or 1983. The court found that these events failed to form a pattern, thus were time-barred pursuant to Board Rule 15. The remedy for such a violation, Appellee argues, is dismissal of the entire complaint, not merely a failure to consider those specific charges that violated Rule 15.

Rule 15 provides:

1. The Board argues that this due process challenge was waived with respect to Ms. Brueggman because Appellee first raised it in his post-trial motions. The Board states that Appellee alleged in his Omnibus Pre-trial Motions only that the charges concerning Ms. Hay, Ms. Hostert, Mary Eilert and Sondra Alan were barred by Board Rule 15. The court ultimately dismissed, pre-trial, the charges relating to Ms. Eilert and Ms. Alan, but heard testimony concerning Ms. Hay and Ms. Hostert, then later decided that, since a pattern was not shown, those charges were also time-barred. It appears that the Board's contention is correct. Nevertheless, I will address the merits of this issue.

Except where the Board determines otherwise for good cause, the Board shall not consider complaints arising from acts or omissions occurring more than four years prior to the date of the complaint, provided, however, that when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.

Judicial Conduct Board Rules of Procedure, Rule 15. The Board contends that it was attempting to prove a pattern of conduct by using the claims regarding Ms. Hay and Ms. Hostert in conjunction with the claims by Ms. Miller and Ms. Brueggman. The court concluded that the Board had not proven a "pattern of conduct," therefore, it would not consider the allegations concerning Ms. Hay and Ms. Hostert. The charges involving Ms. Miller and Ms. Brueggman, however, did not violate Rule 15. The evidence presented to prove the Hay and Hostert charges did not so taint the process so as to warrant dismissing all other claims. Accordingly, the court was correct in considering the remaining charges.

## CROSS-APPEAL ISSUE TWO

■ Next, Appellee argues that the evidence did not support the court's finding that he made unwanted sexual advances toward Ms. Brueggman. The Board was required to prove its allegations by clear and convincing evidence. This Court has defined "Clear and convincing evidence" as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncontradicted . . . provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*La Rocca Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963). Despite contradictory evidence, a court may nevertheless con-

clude that a party has submitted clear and convincing evidence to prove the charges alleged.

 Appellee claims that there was testimony that contradicted Ms. Brueggman's statements in material respects and that the only evidence offered in support of Ms. Brueggman's testimony consisted of her complaints to others. He has failed, however, to demonstrate that the findings of the court were clearly erroneous because he has not cited the alleged "contradictory" evidence. A review of the record reveals that the conclusions of the court were not "clearly erroneous."

### CROSS-APPEAL ISSUE THREE

In his third issue, Appellee asserts that the evidence did not support a conclusion that his conduct toward Ms. Brueggman brought the judicial office into disrepute. In determining whether the Board has sustained its burden of proving that the judicial officer's conduct is so extreme that it brought the judicial office into disrepute, the Court of Judicial Discipline has stated the following:

> [T]he Board must show that the disrespect arising from [a judicial officer]'s actions extends to all judges. In other words, that the wrongful actions of a judicial officer are capable of bringing the judicial office into disrepute is only the first step of inquiry. The second step is that, in fact, universal disrepute resulted.

*In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996).

Appellee argues simply that "proof of a judicial officer's efforts to engage in a relationship with a subordinate does not rise to the level of conduct that casts aspersions upon the judicial office itself." Brief at 24. The court, however, concluded that since Appellee's "behavior as it related to Heather Brueggman was so persistent, so coercive, and so extreme we conclude that disrepute was brought upon the judicial office itself." Court of Judicial Discipline Opinion at 312.

 Whether a judicial officer's conduct brings the judicial office into disrepute is a factual determination that must be decided on a case-by-case basis. Here, Appellee was

the President Judge of the Court of Common Pleas of Fayette County. As part of his duties as the President Judge, he was responsible for supervising the employees of the Adult Probation and Parole Office. Ms. Brueggman was an employee of this office. Therefore, Appellee's actions toward her were not only in his capacity as a judicial officer, but also as her direct supervisor. Appellee's "pursuit" of a sexual relationship with Ms. Brueggman was not merely as a co-equal, instead, he attempted to use his position as the President Judge to pressure her into acquiescing to a sexual relationship. Undoubtedly, the fact that a judicial officer in Appellee's position would use his status and influence to coerce a direct subordinate into an intimate relationship brings the judicial office into disrepute. Accordingly, the court did not err in its determination of this issue.

## CROSS–APPEAL ISSUE FOUR

Appellee also challenges the court's finding that he violated the Election Code, 25 P.S. § 3249(b). Section 3249(b) provides:

> Any wilfully false, fraudulent or misleading statement or entry made by any candidate or treasurer in any statement or report under oath as required by [Article XVI, Primary and Election Expenses], shall constitute the crime of perjury, and be punishable as such according to the laws of this Commonwealth.

25 P.S. § 3249(b). Appellee asserts that the Board failed to prove that he possessed the appropriate *mens rea* for this offense, i.e., that he "knowingly" and falsely affirmed the expense report. The record supports the court's finding that the Board proved by clear and convincing evidence that Appellee knew the expense reports were false when he signed the affidavits.

## CROSS–APPEAL ISSUE FIVE

Finally, Appellee argues that the rules limiting pretrial discovery in prosecutions pursued by the Board deprived him of due process of the law because they impaired his ability

to confront witnesses against him. The Board supplied Appellee with discovery materials including the testimony and sworn statements of witnesses. Appellee's counsel further requested additional discovery, including " 'the names of individuals from whom sworn testimony or statements were taken which were not included in the discovery materials.' " Appellee's Brief at 27. The Board refused the request and claimed that it had provided all evidence that was not privileged relevant to the charges in its complaint. Appellee filed an omnibus motion, asserting that the requested material likely contained exculpatory material and it would reveal the source and motivation for the complaint. The court denied Appellee's request.

This issue is without merit because Appellee has failed to allege how the requested information would have been relevant, if it existed. Appellee vaguely states that from Debra DeFranks' pre-trial testimony, there was reason to doubt the complainant's motives. Ms. DeFranks was represented by Mark Morrison, Esquire at the time she gave her testimony, and Mr. Morrison later appeared at trial on behalf of Ms. Brueggman. There is no explanation regarding why this is significant or relevant, or why this information supports Appellee's overbroad, unspecific discovery request. Therefore, we must reject Appellee's assertion of a violation of his due process.

## CONCLUSION

Accordingly, the decision of the Court of Judicial Discipline is affirmed.

Justice CAPPY files a concurring and dissenting opinion.

Justice CASTILLE files a concurring and dissenting opinion in which Justice NIGRO joins.

CAPPY, Justice, concurring and dissenting.

I join the majority opinion in affirming the decision of the Court of Judicial Discipline. I disagree, however, with the

decision of the majority to prospectively bar court-appointed employees from participation in judicial retention elections.

Retention elections are designed to insulate sitting jurists from being forced to engage in partisan politics. Barring court-appointed employees from involvement in retention election activities on the basis that such involvement creates the appearance of improper political activity undermines the perception that retention elections are non-political. As I strongly believe that greater strides should be taken to enhance the public belief that retention elections are not political, I am compelled to dissent from that portion of the majority opinion.

Accordingly, for the reasons stated herein, I join in part and dissent in part to the majority opinion.

CASTILLE, Justice, concurring and dissenting.

I respectfully dissent from the conclusion of the majority in several respects. First, I believe that appellee did, in fact, violate Canons 1 and 2 of the Code of Judicial Conduct ("Code") through his conduct towards Ms. Brueggman as well as through his involvement in the illicit check cashing and money laundering activities outlined in Part B of the Complaint. Second, I believe that participation in a retention election campaign constitutes partisan political activity, and accordingly, I would conclude that appellee's solicitation of court-appointed employees to assist him in his retention election campaign violated the Guidelines and Canons 1, 2, and 3(B)(2) of the Code. I concur with the remainder of the Majority Opinion.

First, Canons 1 and 2 of the Code provide as follows:

CANON 1. A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY.

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The pro-

visions of this Code should be construed and applied to further that objective.

CANON 2. A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES.

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

Here, the majority overlooks the fact that appellee's conduct towards Ms. Brueggman clearly undermined the integrity of the judiciary, and therefore ran afoul of both Canons 1 and 2 of the Code. After graduating from Penn State University, Ms. Brueggman began employment with the Fayette County Adult Probation Office, which assigned her to appellee's court. Appellee repeatedly called Ms. Brueggman into his robing room to engage her in conversation about personal matters such as whom she dated, whether it was true that "blondes had more fun," and whether the two of them could ever "get together." At one point, appellee called Ms. Brueggman at home and importuned her to "get together" with him, giving her a weekend to think it over. When she declined, appellee asked if she knew how powerful he was and whether she knew that he could get anybody in the county to do anything that he wanted. On another occasion, appellee invited Ms. Brueggman to his chambers for lunch, commented on her physique, and told her that he could help her if she wanted either to go to law school or to become a magistrate.

When Ms. Brueggman continued to rebuff appellee's attempts to initiate a sexual relationship with her, appellee told

Ms. Brueggman that he could have her father fired from his job with the Pennsylvania Department of Transportation, intimated that he would do so unless she agreed to "get together," and generally began to make it more difficult for Ms. Brueggman to perform her job duties. On a subsequent morning, appellee put his arm around Ms. Brueggman in court and advised her that her job could be easy and that she could even be appointed a district justice position. As a result of appellee's unwarranted advances and outright threats, Ms. Brueggman resigned from her position. Throughout the period in question, Ms. Brueggman discussed appellee's harassment with a number of her colleagues and supervisors in the Probation Office, as well as employees of the Corrections Department.

In determining that the above-referenced conduct did not violate Canons 1 and 2, the majority concludes that this conduct, while patently inappropriate, did not implicate the "independence" or "integrity" of the judiciary because it did not in any way relate to the judicial decision-making process. The majority cites no authority in support of its conclusion that inappropriate conduct by a judge must implicate only the judicial decision-making process in order to violate the Canons at issue. I do not believe that this Court should provide such a narrow interpretation to the requirement embodied in these Canons that a judge uphold the integrity of the judiciary. Judges in this Commonwealth—particularly President Judges such as appellee—are vested not only with the responsibility of deciding cases, but also with exercising administrative duties. By making it difficult for Ms. Brueggman to focus on her job as a probation officer and by undermining her efforts to concentrate on her duties in the workplace, appellee demonstrated a wanton disregard for his administrative responsibilities and thereby undermined the integrity of his office.

Additionally, appellee abused the power of his office by using it alternatively as a bludgeon and then as a temptation, first threatening to bring his power to bear on Ms. Brueggman's father, and then assuring Ms. Brueggman that his power could be beneficially exercised to secure her a position

as a magistrate or a district justice. Using one's position as a judge in an attempt to trade sexual favors for the career advancement of probation office employees can hardly be said to inspire confidence in the "integrity"[1] of the judiciary, regardless of whether the rights of litigants are affected. I believe that the conduct of appellee in this matter towards Ms. Brueggman was reprehensible, that such conduct plainly undermined the integrity of the judiciary in violation of Canons 1 and 2, and that the majority of this Court errs by concluding otherwise.[2]

Similarly, I believe that the majority construes Canons 1 and 2 far too narrowly in concluding that the findings of fact pertaining to appellee's money laundering, based on Parts B and C of the Complaint, do not set forth a violation of these Canons. During his retention campaign, appellee formed a campaign committee called the "Committee To Retain President Judge Richard D. Cicchetti" ("the Committee"). At appellee's request, several court-appointed employees cashed checks which had been made out to them and drawn against the Committee's bank account, then turned the money over to appellee. For example, Roberta Meese, who was a court-appointed employee with no connection to the Committee, cashed three checks drawn on the Committee's bank account in the aggregate amount of $1,500 and delivered the cash to appellee. Similarly, the Committee issued checks to Meese's mother and daughter, the proceeds of which were turned over to appellee after the checks were cashed. The Campaign

---

**1.** Webster's defines "integrity" as "the quality or state of being of sound moral principle ...." Webster's New World Dict., 2d College Ed. (1997). Stating the obvious, the above-referenced conduct of appellee exhibited an appalling disregard for "sound moral principles."

**2.** This Court has not determined whether the attempt by a judge to use his position in an attempt to gain sexual favors from employees violates Canon 2, but I note that other states which have examined this issue under their own version of Canon 2 have concluded that such conduct does constitute a violation of the Canon. *See, e.g., In re Seaman,* 133 N.J. 67, 627 A.2d 106, 120 (1993); *In re Miera,* 426 N.W.2d 850 (Minn.1988); *In re Gelfand,* 70 N.Y.2d 211, 512 N.E.2d 533, 518 N.Y.S.2d 950 (1987); *Office of Disciplinary Counsel v. Campbell,* 68 Ohio St.3d 7, 623 N.E.2d 24 (1993); *In re Empson,* 252 Neb. 433, 562 N.W.2d 817 (1997).

Expense Report, which the Committee was required to file and appellee was required to endorse, falsely indicated that these checks had been written to reimburse Meese and her family for the purchase of "party supplies," when, in fact, no party supplies were purchased nor was any money ultimately retained by Meese or her family. Appellee laundered money in an identical fashion through other court-appointed employees and similarly falsified the corresponding expense reports.

In my view, when a judge intentionally falsifies legally required campaign expense reports or launders money that was ostensibly to be used for campaign purposes, that judge plainly undermines the integrity of the judiciary in the eyes of the public. Indeed, I believe that such conduct undermines not only the judiciary but the entire judicial process and, ultimately, the cause of justice. For example, witnesses who are sworn to tell the truth are less likely to appreciate the sacrosanct nature of their oath if they are aware that some of the judges who administer these oaths exhibit a knowing disregard for the truth on disclosure forms which they are required by law [3] to complete accurately. Illegal conduct by a judge which exhibits deceit and dishonesty, such as that exhibited by appellee, not only demonstrates the lack of integrity of that judge but also undermines the reputation of the entire judiciary in the eyes of the public. In sum, I believe that the findings of fact referenced in the Majority Opinion establish a violation of Canons 1 and 2 beyond cavil.

Finally, I also dissent from the conclusion of the majority that participation in a retention election campaign does not constitute partisan political activity. Because I believe that a retention election campaign is an inherently partisan and political activity, I would conclude that appellee violated Canons 1, 2 and 3(B)(2) of the Code as well as this Court's Order of June 29, 1987, 82 Admin. Dkt. No. 1, by recruiting court-appointed employees to assist him in his retention election campaign. Although a candidate in a retention election is not designated as a member of a political party on the ballot, this

---

**3.** By intentionally falsifying the forms at issue, appellee violated Section 3249 of the Election Code. *See* 25 P.S. §§ 3249, 3502.

lack of party designation does not render the campaign process itself non-partisan. The reality in this Commonwealth, as recognized by Judges Sweeney and Magaro, is that judicial candidates are members of political parties. As was established at trial in this matter, the individuals who donated money to respondent's campaign were all members of the Democratic party, and funds donated to respondent's campaign were also used for other Democratic candidates running in that particular election. Thus, the simple lack of party designation on the ballot does not overcome the fact that involvement in a retention election campaign plainly constitutes partisan political activity. In sum, I dissent to the majority's resolution of the issues presented in the appeal of the Judicial Conduct Board, and concur with the majority's resolution of the issues raised in appellee's cross-appeal.

Justice NIGRO joins this concurring and dissenting opinion.