**IN RE Thomas M. NOCELLA, Judge of the Court of Common Pleas, First Judicial District, Philadelphia County**

**No. 7 JD 12**

Court of Judicial Discipline
of Pennsylvania

June 26, 2013
Order August 5, 2013

whether prior warning and an opportunity for correction was provided to the vendor. 434 S.E.2d at 520.

Hon. Robert A. Graci, Chief Counsel, Judicial Conduct Board

Elizabeth A. Flaherty, Assistant Counsel, Judicial Conduct Board

Samuel C. Stretton, Esquire, West Chester, PA for Respondent

BEFORE: Honorable Bernard L. McGinley, P.J., Honorable Charles A. Clement, Jr., Honorable John R. Cellucci, Honorable Timothy F. McCune, Honorable Robert J. Colville, Honorable Carmella Mullen, JJ.

OPINION BY JUDGE COLVILLE

**ORDER**

AND NOW, this 26th day of June, 2013, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent;

That, either party may elect to file written objections to the conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party;

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument;

That, in the event objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will conduct a hearing on the issue of sanctions on July 23, 2013 at 2 p.m. in Commonwealth Court, Courtroom 5001, Fifth Floor, Pennsylvania Judicial Center, Harrisburg, Pennsylvania, and

That, the Judicial Conduct Board and the Respondent shall each file on or before July 16, 2013 a list of such witnesses as either party may intend to present for testimony at that hearing, and shall serve a copy of said list upon the other party.

## I. *INTRODUCTORY STATEMENT*

The Judicial Conduct Board (Board) filed a Complaint with this Court on October 23, 2012 against Judge Thomas M. Nocella, Judge of the Court of Common Pleas of Philadelphia County (Respondent). The Complaint charges Respondent with violations of:

1. Canon 7B(1)(c) of the Pennsylvania Code of Judicial Conduct (Count 1),

2. Canon 2A of the Pennsylvania Code of Judicial Conduct (Count 2),

3. Article V, Section 17(b) of the Pennsylvania Constitution (Count 3), and

4. Article V, Section 18(d)(1) of the Pennsylvania Constitution for engaging in conduct which brings the judicial office into disrepute (Count 4).

The Board has presented its Complaint in two parts: Part A and Part B. Part A consists of allegations relating to Respondent's responses to questionnaires of the Philadelphia Bar Association Commission on Judicial Selection and Retention (Com-

mission) on the occasions of Respondent's candidacies for various judicial offices between 2001 and 2011. Part B consists of allegations relating to Respondent's activities in connection with a Political Action Committee (PAC) called "The Appreciation Fund," in particular having to do with litigation initiated by the Philadelphia Board of Ethics (Ethics Board) against the PAC and Respondent which resulted in Court Orders of June 1, 2007 and September 21, 2007.

The violation charged in Count 1 is based on the facts alleged in Part A.

The violation charged in Count 2 is based on the facts alleged in Part B.

The violations charged in Counts 3 and 4 are based on the facts alleged in Parts A and B.

The Board and the Respondent have submitted Stipulations of Fact pursuant to C.J.D.R.P. No. 502(D)(2). The Court has accepted those stipulations which are set out below as Findings of Fact Nos. 1–95.

## II. *FINDINGS OF FACT*

1. From December 2, 2008 through January 3, 2010, Judge Nocella served as appointed Judge of the Municipal Court of Philadelphia, with an office located at The Criminal Justice Center, 1301 Filbert Street, Philadelphia, Pennsylvania, 19107.

2. Since on or about January 2, 2012, Judge Thomas M. Nocella has served continuously to the present as a duly elected Court of Common Pleas Judge in the First Judicial District, Philadelphia County, with an office located at Family Court Division, 1801 Vine Street, Philadelphia, Pennsylvania, 19103.

3. On October 23, 2012, the Board filed the instant Complaint against Judge Nocella.

4. By Court Order dated November 9, 2012, the Supreme Court of Pennsylvania suspended Judge Nocella with pay.

5. As Judge of the Court of Common Pleas Court and the Municipal Court, Judge Nocella is, and was at all times relevant hereto, subject to all the duties and responsibilities imposed on him by the Constitution of the Commonwealth of Pennsylvania and the Code of Judicial Conduct.

6. The parties stipulate that The Employment Chronology of Judge Thomas M. Nocella 2001 to present, as filed by Board counsel on January 14, 2013, is accurate.

7. Judge Nocella was a judicial candidate in Philadelphia in the following three primary elections:

 a. 2001 Candidate for Judge of the Municipal Court;

 b. 2005 Candidate for Judge of the Court of Common Pleas; and

 c. 2009 Candidate for Judge of the Municipal Court of Philadelphia.

8. Judge Nocella lost all three primary elections.

9. Judge Nocella was not a judicial candidate in the 2011 primary election.

10. On August 25, 2011, following nomination by the Philadelphia Democratic ward leaders, Judge Nocella became the party candidate in the general election for

a vacated judicial seat with the Court of Common Pleas of Philadelphia.

11. When an attorney becomes a candidate for judicial office in Philadelphia, the Philadelphia Bar Association Commission on Judicial Selection and Retention (Commission) notifies the candidate of its confidential evaluation process and requests that the candidate participate.

12. During the 2001, 2005 and 2009 primary elections and the 2011 general election, Judge Nocella participated in the Commission's evaluation process for judicial candidates.

13. Every candidate who participates in the Commission's evaluation process is required to complete and submit a questionnaire. The information contained in a submitted questionnaire is used as a basis for the Commission to rate the candidate as "recommended" or "not recommended."

14. Each questionnaire contains a Certification Statement with the following language:

> I certify that all the statements made in this questionnaire are true, complete and correct to the best of my knowledge and belief and are made in good faith. I am aware that any changes or additions to the foregoing information must be submitted promptly to the Commission on Judicial Selection and Retention.

15. As part of the evaluation process, Judge Nocella completed and submitted the following questionnaires:

a. 2001 Personal Data Questionnaire (for the 2001 primary election);

b. 2004 Update Evaluation Questionnaire (for the 2005 primary election);

c. 2009 Personal Data Questionnaire (for the 2009 primary election); and

d. 2011 Update Evaluation Questionnaire (for the 2011 general election).

Judge Nocella signed the Certification Statement on the 2001, 2004, 2009 and 2011 questionnaires.

16. The Commission's evaluation process also includes the appointment of a five-member Investigative Team to interview the candidate and others with information concerning the candidate's background and qualifications.

17. The Investigative Team reports its findings on the day of the judicial candidate's scheduled appearance before the full Commission, at which time the Commission Chair questions the candidate,

18. If the Commission concludes that the candidate merits a "recommended" rating after his or her first appearance, then no further appearance is required. If the Commission decides upon a "not recommended" rating, then the candidate may choose to participate in a second appearance before the Commission in order to answer additional questions and present a statement to persuade the Commission to issue a "recommended" rating.

19. Following evaluations by its Investigative Teams, the Commission issued the following ratings to Judge Nocella during his judicial candidacies:

| a. | 2001 | First Appearance: | Recommended; |
|----|------|-------------------|--------------|
| b. | 2005 | First Appearance:<br>Second Appearance: | Preliminary Not Recommended<br>Recommended; |
| c. | 2009 | First Appearance:<br>Second Appearance: | Preliminary Not Recommended<br>Recommended; and |
| d. | 2011 | First Appearance: | Recommended. |

20. Following his initial appearances in 2005 and 2009, the Commission notified Judge Nocella by letter of his preliminary "not recommended" rating and identified the following criteria as problematic:

 a. Financial responsibility (2005 and 2009);

 b. Demonstrated sound judgment in one's professional life (2005 and 2009);

 c. A record and reputation for excellent character and integrity (2009); and

 d. Demonstrated administrative ability (2009).

21. In 2005 and 2009, Judge Nocella participated in a second appearance before the Commission and persuaded the Commission to issue a "recommended" rating.

22. Following his second appearances in 2005 and 2009, the Commission notified Judge Nocella in writing of his "recommended" status. The letters contained the following directive to disclose any material facts that altered or added to the information he submitted in his questionnaires, including the time period after the Commission issued a "recommended" rating:

The Commission's Guidelines require you to notify the Commission promptly of any material facts that would require changes to any of the answers previously supplied by you in the candidate's questionnaire.

23. On February 5, 2009, Judge Nocella completed a full length Personal Data Questionnaire and submitted it to the Commission. At that time he was both an appointed judge of the Municipal Court of Philadelphia and a candidate for the same position.

24. Judge Nocella signed the Certification Statement at the bottom of the 2009 Personal Data Questionnaire, certifying that his statements were true, complete and correct and acknowledging his duty to submit promptly to the Commission any changes or additions to the information contained in his questionnaire.

25. Question No. 21 in the 2009 Personal Data Questionnaire required Judge Nocella to list cases in which he was sued by a client. Judge Nocella responded, "No change since prior filing," referring to three (3) cases listed in his 2001 questionnaire and one (1) case listed in his 2004 questionnaire for a total of four (4) cases.

26. Question No. 22 in the 2009 Personal Data Questionnaire asked Judge Nocella to list all cases in which he was "ever a party or otherwise involved in or had a pecuniary interest in any civil or criminal proceedings." Judge Nocella responded that in addition to cases named in prior question questionnaires, "I was named as a defendant in a civil matter." In 2001, Judge Nocella named one case in which he was a defendant. In 2004, he did not provide additional case names. Therefore,

his 2009 response included a total of two cases.

27. The 2009 Investigative Team performed a docket search and discovered approximately 30 cases in which Judge Nocella was either a defendant or a respondent.

28. In response to Questions No. 21 and 22 in his 2009 Personal Data Questionnaire, Judge Nocella listed a total of six cases in which he was either a defendant or respondent and failed to disclose 24 other cases.

29. On February 5, 2009, Judge Nocella was deposed by counsel for the Philadelphia Board of Ethics in the case *Philadelphia Board of Ethics v. The Appreciation Fund* (April Term 2007, Case No. 003419).

30. On March 11, 2009, the Philadelphia Board of Ethics filed a Petition for Contempt against the Appreciation Fund and named Judge Nocella and Ernesto DeNofa as additional defendants in the case *Philadelphia Board of Ethics v. The Appreciation Fund. Ernesto DeNofa, Thomas Nocella* (April Term 2007, Case No. 070403419).

31. The February 5, 2009 deposition and the March 11, 2009 Petition for Contempt, naming Judge Nocella as an additional defendant in the Philadelphia Board of Ethics matter, were changes or additions to the information contained in Judge Nocella's 2009 Personal Data Questionnaire and, therefore, material to the Commission's evaluation of his candidacy for the position of judge.

32. On April 17, 2009, the Commission's Investigative Team interviewed Judge Nocella.

33. Prior to his April 17, 2009 interview with the Commission's Investigative Team, Judge Nocella failed to disclose to the Commission information about his involvement in the case *Philadelphia Board of Ethics v. The Appreciation Fund, Ernesto DeNofa, Thomas Nocella,* specifically that he was deposed, that he was named as a defendant and that he was the subject of a Petition for Contempt.

34. The Investigative Team independently discovered the Petition for Contempt and questioned Judge Nocella about it and the Philadelphia Board of Ethics matter at the April 17, 2009 interview.

35. In his 2009 Personal Data Questionnaire, Judge Nocella disclosed that he was a named party in *Straughter–Carter Post No. 6627, Veterans of Foreign Wars of the United States et al. v. Monastery Hill Partners, L.P. et al.,* Philadelphia County Court of Common Pleas, January Term, 2007, Case No. 070103406 (VFW), and provided a brief description of the matter.

36. In response to Question No. 22 in his 2009 Personal Data Questionnaire, which required him to "give the particulars about any civil or criminal proceedings in which he had been a party," Judge Nocella disclosed some information pertaining to the VFW lawsuit but failed to disclose particular, material facts about the case, including the facts that he misrepresented his authority to execute documents and collected a $60,000 fee at the property closing.[1]

1. The VFW case was an ongoing matter in 2009 while Judge Nocella served as appointed Municipal Court Judge of Philadelphia, in 2011 while he was a judicial candidate and in 2012 when he assumed the bench as Judge of the Court of Common Pleas of Philadelphia. On April 12, 2012, the parties reached a settlement agreement in which Judge Nocella agreed to pay $80,000 to the VFW at the rate of $2,000 per month. On July 15, 2012 the United States Bankruptcy Court for the Eastern District of Pennsylvania issued an Order for Stipulation Settling Adversarial Procedure which declared that the debt owed by Judge

37. In the 2011 general election, Judge Nocella was a judicial candidate for the Court of Common Pleas of Philadelphia and participated in the Commission's evaluation process.

38. A "recommended" rating is a three year presumptive rating. However, if a judicial candidate runs again within a three year period after the "recommended" rating is issued, the Commission has discretion to either waive or require a short form Update Evaluation Questionnaire, an additional investigation and an appearance before the Commission.

39. In 2001, despite the 2009 "recommended" rating, the Commission requested that Judge Nocella submit an Update Evaluation Questionnaire, assigned an Investigative Team to interview him and others about his qualifications and required him to appear before the Commission.

40. On September 29, 2011, Judge Nocella submitted a one page short form Update Evaluation Questionnaire to the Commission.

41. In his 2011 Update Evaluation Questionnaire, Judge Nocella checked "No" in response to the sole question,

"Have any material facts occurred since you completed the last questionnaire which would require a change in any of the answers given by you?"

Therefore, he represented to the Commission that no material facts occurred since his February 5, 2009 Personal Data Questionnaire.

42. Judge Nocella signed the Certification Statement at the bottom of the 2011 Update Evaluation Questionnaire certifying that his statements were true, complete and correct, and acknowledged his duty to submit promptly to the Commis-

sion any changes or additions to the information.

43. Since Judge Nocella did not submit new information in his 2011 Update Evaluation Questionnaire, the Certification Statement related back to the information contained in the February 5, 2009 Personal Data Questionnaire.

44. Based on the 2005 and 2009 preliminary "not recommended" ratings, Judge Nocella was aware that the Commission had previously identified the criteria of financial responsibility, judgment in his professional life, record of character and integrity, and administrative ability as problematic when determining his rating as a judicial candidate.

45. When Judge Nocella submitted his 2011 Update Evaluation Questionnaire, he failed to disclose multiple material facts that would change his answers to the questions posed on his 2009 Personal Data Questionnaire, particularly in regard to financial and legal matters. The material facts included the following:

a. On September 9, 2009, Judge Gary DiVito of the Court of Common Pleas of Philadelphia found Judge Nocella and codefendant Ernesto DeNofa in contempt of two court orders regarding a Philadelphia Board of Ethics matter. *Philadelphia Board of Ethics v. The Appreciation Fund, Ernesto DeNofa, Thomas Nocella*;

b. On November 17, 2009, Judge Nocella and Ernesto DeNofa entered into a settlement agreement with the Philadelphia Board of Ethics in the amount of $16,000. *Philadelphia Board of Ethics v. The Appre-*

Nocella was non-dischargeable. *Straughter–Carter Post No. 6627, Veterans of Foreign Wars of the United States et al. v. Nocella,* Case No. 11–147889–ELF; *Diversified Realty Services, Inc. v. Nocella,* No. 12–00221–ELF.

ciation Fund, Ernesto DeNofa, Thomas Nocella;

c. On March 11, 2011, two IRS liens were filed against Judge Nocella in the amount of $358,961 and $110,748;

d. On April 27, 2011, creditor Czarnecki Profit Sharing filed a judgment against Judge Nocella in the amount of $923,152;

e. On May 17, 2011, creditor Casimir Czarnecki filed a judgment against Judge Nocella in the amount of $306,174; and

f. On June 15, 2011, Judge Nocella filed a Chapter 13 voluntary bankruptcy petition, In re: Thomas M. Nocella, U.S. Bankruptcy Court, Eastern District of Pennsylvania, No. 11–14789–ELF.

46. After the submission of his September 29, 2011 Update Evaluation Questionnaire and prior to his October 17, 2011 interview by the Investigative Team, Judge Nocella failed to disclose to the Commission or its Investigative Team the material facts listed in Paragraph No. 45 which occurred subsequent to the submission of his 2009 Personal Data Questionnaire.

47. During his October 17, 2011 interview with the Investigative Team and his October 28, 2011 appearance before the Commission, Judge Nocella failed to disclose the material facts listed in Paragraph No. 45 which were additions or changes to the responses in his 2009 Personal Data Questionnaire.

48. Throughout his 2011 judicial candidacy, Judge Nocella failed to disclose to the Commission any of the material listed in Paragraph 45 which occurred after he submitted his 2009 Personal Data Questionnaire. The omission of material facts resulted in a misrepresentation of his credentials.

49. On October 28, 2011, Commission Vice–Chair Gaeton J. Alfano contacted Judge Nocella by telephone and advised him that the Commission rated him as a "recommended" judicial candidate.

50. Between October 28, 2011 and the November 8, 2011 election, Judge Nocella failed to disclose to the Commission the material facts listed in Paragraph No. 45 which occurred subsequent to the submission of his 2009 Personal Data Questionnaire.

51. On November 8, 2011, former Municipal Court Judge Nocella was elected to the position of Judge of the Court of Common Pleas of Philadelphia.

52. The Appreciation Fund is a Political Action Committee (PAC) located in Philadelphia, Pennsylvania.

53. Ernesto DeNofa served as Treasurer of the Appreciation Fund at all times relevant to the following facts.

54. Beginning on or about April 27, 2007, and at all relevant times thereafter, Judge Nocella, serving in his capacity as an attorney, provided legal services to Ernesto DeNofa and the Appreciation Fund on a pro bono basis. See Nocella Dep. Tr. 9:5–22; 10:6–11:14 & 14:4–16:9, Feb. 5, 2009.

55. The Philadelphia Board of Ethics is responsible for the enforcement of the campaign finance laws of the City of Philadelphia as set forth in Chapter 20–1000 of the Philadelphia Code.

56. In Philadelphia, the treasurer of a political action committee must file a report of receipts and expenditures with the Philadelphia Board of Ethics at the same time that he or she files such a report with the Pennsylvania Department of State, pursuant to Article XVI of the Pennsylvania Election Code (25 P.S. § 3241 et

seq.) Chapter 20–1000 Philadelphia Code § 20–1006(1).

57. Effective January 17, 2007, the Philadelphia Board of Ethics instituted a new policy requiring political action committees to file campaign finance reports, pursuant to Chapter 20–1000 Philadelphia Code § 20–1006, in a specific electronic format. Philadelphia Board of Ethics Regulation No. 1, Electronic Filing of Campaign Finance Reports (Jan. 17, 2007).

58. In 2007, the failure to file the required report in an electronic format with the Philadelphia Board of Ethics was a violation of Chapter 20–600 (Standards of Conduct and Ethics) and the violator was subject to penalties under that Chapter. Chapter 20–1000 Philadelphia Code § 20–1006(4).

59. In 2007, the penalty set forth for violation of Chapter 20–600 was fifteen hundred dollars ($1,500) for each violation that occurred in 2007. Chapter 20–600 Philadelphia Code § 20–612.

60. The Appreciation Fund filed a Cycle 7 annual report of its 2006 campaign contributions with the Pennsylvania Department of State and was required to file a report of the same information in an electronic format with the Philadelphia Board of Ethics by January 31, 2007.

61. In 2007, the Appreciation Fund failed to timely file a Cycle 7 annual report in an electronic format with the Philadelphia Board of Ethics either by the initial deadline of January 31, 2007 or by the extended deadline of April 4, 2007.

62. On April 27, 2007, the Philadelphia Board of Ethics filed a Petition with the Court of Common Pleas of Philadelphia seeking the imposition of the statutory penalty of fifteen hundred dollars ($1,500) per day against the Appreciation Fund for each day that it failed to file its Cycle 7 annual report in an electronic format.

*Philadelphia Board of Ethics v. Appreciation Fund,* Case No. 070403149.

63. On April 30, 2007, the Appreciation Fund filed its annual report in an electronic format with the Philadelphia Board of Ethics.

64. By Court Order, on June 1, 2007, the Honorable Gary DiVito of the Court of Common Pleas of Philadelphia granted the Petition and directed the Appreciation Fund to electronically file the required Cycle 7 report, in accordance with Section 20–1006 of the Philadelphia Code within five business days of the date of the Order, to pay a civil penalty of fifteen hundred dollars ($1,500) per day for each day after April 4, 2007 until the date that the report is filed and to pay reasonable attorney's fees and costs.

65. The Appreciation Fund failed to timely comply with the June 1, 2007 Order to pay the accrued penalties.

66. On August 9, 2007, the Philadelphia Board of Ethics filed a Petition for Contempt and to Enter Judgment against the Appreciation Fund.

67. On August 28, 2007, the Application Fund, by and through its attorney, Thomas M. Nocella, Esquire, filed an Answer to Petition for Contempt and to Open Judgment and a Motion to Strike Judgment Entered by Default.

68. By Order dated September 21, 2007, Judge DiVito granted the Philadelphia Ethics Board Petition for Contempt and directed the Appreciation Fund to pay a civil penalty of $39,000 to the Philadelphia Board of Ethics, in accordance with the June 1, 2007 Order, within five business days of the date of the Order.

69. On October 4, 2007, Judge DiVito filed an Order and Opinion in which he denied the Appreciation Fund's Motion to Strike Judgment Entered by Default.

70. The Appreciation Fund failed to comply with the September 21, 2007 Order to pay the $39,000 civil penalty within five business days.

71. On December 1, 2007, the Appreciation Fund's account at PNC Bank contained $16,919.

72. While the Appreciation Fund was subject to the June 1, 2007 and September 21, 2007 Court Orders, Judge Nocella provided legal counsel to and assisted Fund Treasurer Ernesto DeNofa with the use of the remaining funds in the PNC bank account to make the following payments:

a. December 7, 2007: $13,550 to Perms Landing Caterers for costs incurred at a May 15, 2007 Bob Brady mayoral campaign event;

b. January 26, 2008: $390 to Creative Access for the services of a sign language interpreter at a January 27, 2007 Bob Brady campaign event; and

c. March 17, 2008: $2,500 to Judge Nocella for legal services which he had provided in a pro bono basis prior to such date.

73. On December 12, 2007, the Philadelphia Board of Ethics served the Appreciation Fund with discovery requests, specifically seeking information about the financial status of the Appreciation Fund.

74. Judge Nocella did not respond to the Philadelphia Board of Ethics' discovery requests until after the January 26, 2008 and March 17, 2008 checks were issued and the Appreciation Fund's available funds were depleted.

75. By March 31, 2008, the Appreciation Fund's account contained $379.

76. On February 5, 2009, then Municipal Court Judge Nocella submitted to a deposition by the Philadelphia Board of Ethics.

77. On March 11, 2009, the Philadelphia Board of Ethics filed another Petition for Contempt against the Appreciation Fund and named Judge Nocella and Ernesto DeNofa as additional defendants.

78. In its March 11, 2009 Memorandum in Support of Petition for Contempt, the Philadelphia Board of Ethics alleged the following: (1) Judge Nocella and Ernesto DeNofa intentionally dissipated the funds remaining in the Appreciation Fund bank account despite court orders to pay the $39,000 fine; (2) Judge Nocella misrepresented the facts surrounding the dissipation of funds to counsel for the Board of Ethics, including statements made during his deposition; and (3) the payment of funds, particularly the legal fee to Judge Nocella, was fraudulent.

79. In the March 11, 2009 Memorandum in Support of Petition for Contempt, the Philadelphia Board of Ethics set forth: 1. inconsistencies between Judge Nocella's February 5, 2009 deposition testimony and Ernesto DeNofa's March 25, 2008 deposition testimony; and 2. inconsistencies within Judge Nocella's deposition testimony, before and after the introduction of DeNofa's March 25, 2008 deposition testimony.

80. In its March 11, 2009 Memorandum in Support of Petition for Contempt, as a basis for its allegations set forth in Paragraph 78, the Philadelphia Board of Ethics cited sections of Judge Nocella's February 5, 2009 deposition as evidence that he made misrepresentations about his involvement in dissipating the funds from the PNC bank account of the Appreciation Fund. The following excerpts compare testimony of Ernesto DeNofa with that of Judge Nocella.

*Deposition of Ernesto DeNofa by the Philadelphia Board of Ethics*

*March 25, 2008*

In his deposition, Mr. DeNofa repeatedly stated that he and Judge Nocella came

up with the idea to pay the Penns Landing Caterers' bill.

A. I contacted my attorney, Tom [Nocella], and asked to see what he could do about paying some—some un—unpaid bills. And Tom looked into it and this is what he came up to, came up with.

Q. And when you say we, who do you mean?

A. Tom and myself—

Q. Okay.

A. —talked.

Q. Did anyone else, was anyone else involved in the decision to pay this catering bill?

A. Not really. It was totally my decision. (DeNofa Dep. 15:9–24, Mar. 25, 2008.)

Q. Have you spoken with anyone else about your payment to Penns— about making a payment to Penns Landing Caterers?

A. Just, Tom, Tom Nocella, the attorney. (DeNofa Dep. 52:19–24.)

Q. Does anyone else have decision-making authority for the Appreciation Fund.

A. No. Just I. (DeNofa Dep. 104:10–13.)

*Deposition of Judge Thomas M. Nocella by the Philadelphia Board of Ethics*

*February 5, 2009*

In his deposition, Judge Nocella stated that Carol Campbell was involved in the decision to pay the Penns Landing Caterers' bill and acted as an intermediary between Judge Nocella and Mr. DeNofa.

A. The way it went was that when I finally negotiated the figure, I contacted Ms. Campbell. I believe Ms. Campbell then contacted Mr. DeNofa and the check was generated at that point. (Nocella Dep. 99:4–16, Feb. 5, 2009.)

81. In its Memorandum in Support of Petition for Contempt, the Philadelphia Board of Ethics also cited the following excerpts from the transcript of the February 5, 2009 deposition of Judge Nocella as a basis for its allegation that he made misrepresentations about the dissipation of funds from the PNC bank account of the Appreciation Fund,

Early in his deposition, Judge Nocella testified that Ms. Campbell and Mr. DeNofa had discussions about using the money in the Appreciation Fund bank account to pay the Penns Landing Caterer and that Ms. Campbell contacted Mr. DeNofa about issuing a check to Penns Landing Caterers.

Q. Is it your testimony that you didn't discuss with Mr. DeNofa using the Appreciation Fund bank account to pay the invoice from Perms Landing Caterers to Bob Brady For Mayor?

A. I think when we first raised it—it wasn't my suggestion. If it was anybody's suggestion, it might have been Ms. Campbell's suggestions. (Nocella Dep. 99:17–100:3.)

A. After we came up with the settlement with Penns Landing Caterer and before it was paid, then I believe she was the one who moved it along as far as Mr. DeNofa was concerned, as far as getting it paid from the Appreciation Fund.

She may have convinced him that the—and he believed—he really believed himself that the Appreciation Fund owed Mr. Brady that money and that he put that—he gave that priority to the judge's Order. (Nocella Dep. 110:12–24.)

Later, after reviewing portions of the transcript from Mr. DeNofa's March 25, 2008 deposition, Judge Nocella changed his testimony and stated that he did not know for a fact that Ms. Campbell and Mr. DeNofa had discussed the payment idea.

A. Yes. Well, not extensively. I don't know how—he [Mr. DeNofa] discussed it with Carol Campbell. I wouldn't characterize it as extensively, I don't know how far their discussions went, but he did discuss it with Ms. Campbell.

Q. And you've testified she came up with the idea.

A. Yes. (Nocella Dep. 133:9–18.)

A. I don't know how many times she [Carol Campbell] spoke with him. I don't know if it was one or five. I'm sure they spoke. I don't know that. I was never in their presence when they spoke and neither one told me they spoke to each other, but I'm sure they spoke.

Q. I'm sorry. Neither one of them told you that they had spoken with each other?

A. That's right.

Q. So when you've been testifying thus far that Mr. DeNofa must have gotten this idea from Ms. Campbell, that was conjecture?

A. Well, since she was the first one to bring it up to me, I assumed she spoke with him because they spoke daily about many items. Everyone spoke daily with her. I spoke to her daily.

Q. And you don't know if Mr. DeNofa spoke with her—

A. I believe he spoke with her.

Q. —daily or otherwise?

A. He never told me he spoke with her. She never told me she spoke with him, but I'm sure they spoke about it because she's the one who brought it up. I'm assuming they spoke.

Q. She brought it up with you?

A. She called me to begin the negotiations about it, and then she's the one that thought it should come from the Appreciation Fund. (Nocella Dep. 133:22–135:11.)

Finally, Judge Nocella admitted that he communicated to Mr. DeNofa the idea of using the Appreciation Fund bank account to pay the Penns Landing Caterers' bill.

Q. Did Ms. Campbell ask you to discuss the Appreciation Fund making this payment with Mr. DeNofa?

A. Yes, After we came up with the figure, then she wanted me to speak to Mr. DeNofa about paying it from the Appreciation Fund. So then that's when Mr. DeNofa and I first started speaking about it.

Q. So you conveyed to Mr. DeNofa Carol Campbell's idea of using the Appreciation Fund account to make payment on this invoice?

A. Yes, I did. Now, she may have done it too, herself, she might have done it, but I don't know if she ever did. I'm sure she did because I said they spoke every day.

Q. In other words, so I'm clear, as far as you know, you were the person who initiated this idea with Mr. DeNofa to use the Appreciation Fund bank account to make payment on the catering bill.

A. On her suggestion, I spoke to him concerning it. Whether she directly spoke to him, I'm unaware. So the answer is yes.

Q. Yes, as far as you know, you are the person who initiated the idea to Mr. DeNofa.

A. I brought the idea to Mr. DeNofa at the request of Ms. Campbell. (Nocella Dep. 135:12–136:122.)

82. By Court Order, on September 9, 2009, Judge DiVito granted the Philadelphia Board of Ethics Petition and held that Judge Nocella and Ernesto DeNofa were in contempt of the Court Orders of June 1, 2007 and September 21, 2007. Judge DiVito directed Judge Nocella and Ernesto DeNofa to pay, jointly and severally, a civil penalty of $39,000 within 30 business days and reasonable attorney fees and enjoined them from disposing of any real or personal property subject to execution of the judgment.

83. On October 8, 2009, Attorney Samuel C. Stretton, on behalf of Judge Nocella, filed a Notice of Appeal from the September 9, 2009 Order.

84. On November 17, 2009, while Judge Nocella served as appointed Municipal Court Judge, he and Ernesto DeNofa settled the case with the Philadelphia Board of Ethics and agreed to pay $16,000.

85. On November 23, 2009, Attorney Stretton filed a Praecipe for Discontinuance and on December 7, 2009, the Appeal was withdrawn.

86. There is no record that the contempt of court was purged.

87. In January, 2010, a complainant filed the first Confidential Request for Investigation (CRI) with the Board and alleged that Judge Nocella engaged in misconduct.

88. On February 12, 2010, after determining that the allegations were specific to Judge Nocella's conduct as attorney to the Appreciation Fund, then Judicial Conduct Board Chief Joseph A. Massa, Jr. referred the matter to Paul J. Killion, Chief Counsel to the Disciplinary Board of the Supreme Court of Pennsylvania.

89. The Office of Disciplinary Counsel investigated Judge Nocella's 2007 and 2008 conduct, which occurred while he served as attorney to the Appreciation Fund and Ernesto DeNofa.

90. Judge Nocella's mentor, Carol Campbell died in November 2008 and therefore, she did not provide testimony in the Office of Disciplinary Counsel investigation.

91. On February 2, 2011, after its determination that Judge Nocella's conduct violated the Pennsylvania Rules of Professional Conduct, the Disciplinary Board issued an Informal Admonition to Judge Nocella, admonishing him for the following conduct:

a. Violations of RPC 4.1(a) and RPC 8.4(c): In February 2008, in separate telephone conversations with outside counsel to the Philadelphia Board of Ethics, Michael Tarringer, Esquire and Cheryl A. Krause, Esquire, Judge Nocella misrepresented that the Appreciation Fund had no assets; and

b. Violations of RPC 8.4(a) and RPC 8.4(d): In 2007 and 2008, Judge Nocella assisted Appreciation Fund Treasurer DeNofa in violating Judge DiVito's June 1, 2007 and September 21, 2007 Orders.

92. Rule 4.1(a) provides that a lawyer must be truthful in communicating with others, including opposing counsel and "may not knowingly make a false statement of material fact or law to a third person." Pa.R.P.C. No. 4.1(a).

93. Under Rule 8.4, "it is professional misconduct for a lawyer to (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepre-

sentation; or (d) engage in conduct that is prejudicial to the administration of justice." Pa.R.P.C. No. 8.4(a), (c) & (d).

94. In its Informal Admonition, the Disciplinary Board did not address Judge Nocella's 2009 conduct, because he was a Municipal Court Judge when the following events occurred:

a. On February 5, 2009, the Philadelphia Board of Ethics deposed Judge Nocella;

b. On March 11, 2009, the Philadelphia Board of Ethics named Judge Nocella and Mr. DeNofa as additional respondents in the Appreciation Fund case; and

c. On September 9, 2009, Judge DiVito adjudicated Judge Nocella and Mr. DeNofa, personally and individually, in contempt of court.

95. On November 14, 2011, the Board received the second CRI upon which the instant Complaint is based.

## III. *DISCUSSION*

We will address the four Counts in the order in which they are presented in the Board's Complaint.

*Count 1.*

 Count 1 charges that the facts alleged in Part A of the Complaint describe conduct which is a violation of Canon 7B(1)(c) of the Code of Judicial Conduct. Canon 7B(1)(c) provides in pertinent part:

(1) Candidates, including an incumbent judge, for a judicial office that is filled either by public election between competing candidates or on the basis of a merit system election:

(c) should not ... misrepresent their identity, qualifications, present position, or other fact.

The conduct described in Part A of the Board's Complaint—which is admitted—which is stipulated to have occurred—establishes repeated violations of Canon 7B(1)(c). (Findings of Fact Nos. 1–51.) It establishes that Respondent lied repeatedly about his qualifications and other facts on the numerous questionnaires he submitted to the Commission on Judicial Selection and Retention.[2] When this Commission notified him in 2005 and 2009 that he had been rated "Not Recommended" it advised him that the reason for that had to do with his "financial responsibility, judgment in his professional life, and record of character and integrity." (Findings of Fact Nos. 20 and 44.) Despite this Respondent lied on the 2009 Questionnaire in response to a question asking him to list any cases in which he was a defendant or respondent. He listed six cases. A simple docket search by the Commission established that there were 30 such cases. (Findings of Fact Nos. 25–28.) Most notable of the 24 cases undisclosed was the case *Philadelphia Board of Ethics v. Nocella, et al.,* in which case Respondent was the subject of a Petition for Contempt of Court.[3] (Findings of Fact Nos. 22–34.)

---

**2.** We acknowledge counsel for Respondent's contention that Respondent did not ever knowingly or intentionally lie, but rather Respondent only inadvertently misrepresented facts on occasion. While no disinterested fact finder may ever be so privileged as to know, as a fact, the true intent of a witness or party whose statements are the object of review; in this instance, and particularly in light of both the number and the circumstances of Respondent's various "misrepresentations" this

Court is incapable of reasonably concluding that they were, as suggested by counsel for Respondent, purely unintended misrepresentations.

**3.** The Petition for Contempt was subsequently granted and Respondent was held in contempt of court for disobeying two court orders.

Other arresting incidents of concealment include his failure to disclose on the Update Evaluation Questionnaire filed September 29, 2011:

 a. that, on September 9, 2009, the Petition of the Philadelphia Board of Ethics requesting that Respondent be held in contempt of two court orders was granted;

 b. that, on March 11, 2011, two IRS liens were filed against Respondent in the amounts of $358,961 and $110,748;

 c. that, on April 27, 2011, the Czarnecki Project Sharing Fund filed a judgment against Respondent in the amount of $923,152;

 d. that, on May 17, 2011, Casimir Czarnecki filed a judgment against Respondent in the amount of $306,174; and

 e. that, on June 15, 2011, Respondent filed a Chapter 13 voluntary bankruptcy petition in the Eastern District of Pennsylvania. (Finding of Fact No. 45.)

There is no point in belaboring this issue or of further repeating the facts which are set out in the Findings of Fact and which clearly establish that Respondent repeatedly violated Canon 7B(*l*)(c) of the Code of Judicial Conduct.

*Count 2.*

■ In Count 2, the Board has charged that Respondent's conduct set out in Part B (Findings of Fact Nos. 52–86) constitutes a violation of Canon 2A of the Pennsylvania Code of Judicial Conduct and therefore Respondent is subject to discipline pursuant to Article V, § 18(d)(1) of the Pennsylvania Constitution.

Canon 2A provides:

Judges should respect and comply with the law and should conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Insofar as the Board may be charging that the conduct described in Part B of the Complaint is a violation of Canon 2A for its failure to promote "public confidence in the integrity and impartiality of the judiciary" our decision here is controlled by our holding in *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997).

In that case we said:

Canon 2 ... [is] directed at conduct which would impugn or detract from ... the integrity and impartiality of the judiciary. "Integrity" must be read in *pari materia*... with "impartiality" in Canon 2. Both of these words ... exhort judges to carefully preserve all appearance of even-handedness, of not favoring or appearing to favor either side in a case, of being and appearing free from influence.

*Cicchetti, supra,* at 313.

We then reiterated our holding in *In re Smith, supra,* at 1239 where we said:

Canon 2 in general is directed towards conduct which could potentially cause the public or litigants to believe that a judge is not acting impartially.

*Cicchetti, supra,* at 313.

We then noted that:

The instructions contained in subsection B. of Canon 2: that "a judge should not allow his family, social or other relationships to influence his judicial conduct or judgment" and that he should not "convey or knowingly permit others to convey the impression that they are in a special position to influence him," provide further support for this interpretation of Canon 2.

*Id.,* n.6.

On appeal the Supreme Court affirmed our holding that Cicchetti's conduct was not a violation of Canon 2—and our rea-

soning—in a clear, concise and emphatic paragraph:

> Canon 2 ... addresses the judicial decision-making process and seeks to avoid the appearance of influence over judicial activities. Appellee is not subject to censure for a violation of Canon 2 based on his conduct toward Ms. Brueggman because it was independent of his decision-making duties.

*In re Cicchetti*, 560 Pa. 183, 201, 743 A.2d 431, 441 (2000).

Likewise, this Respondent's conduct had nothing to do with his decision-making duties. As a consequence, his conduct was not a violation of Canon 2A.

Insofar as the Board may be charging that the conduct described in Part B of the Complaint is a violation of the provision of Canon 2A which requires judges to "comply with the law," no determination of that issue can be made without reference to the case of *In re Harrington*, 877 A.2d 570 (Pa.Ct.Jud.Disc.2005) and especially to the Supreme Court's Order in that case on appeal from this Court, 587 Pa. 407, 899 A.2d 1120 (2006).

In *Harrington* this Court held that Harrington was subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution for conduct such that brings the judicial office into disrepute. On appeal the Supreme Court affirmed that holding, but in its Order doing so, the Supreme Court noted its disapproval of our holding that Harrington's conduct had violated a law and thus was a violation of Rule 2A[4] which requires magisterial district judges to "comply with the law." The Supreme Court disapproved our holding that Harrington had violated Rule 2A because her conduct, though illegal, "did not implicate the decision-making process," citing *In re Cicchetti*, 560 Pa. 183, 743 A.2d 431 (2000). We recognize that the Supreme Court's disapproval of our holding that Harrington's conduct was a violation of Rule 2A was dictum, however, the Court's disapproval is stated without equivocation and with no observable hesitation. In these circumstances we are strongly constrained to make our holding here in concord with the Supreme Court's announced position, and so we hold that the Board has not established a violation of Canon 2A because the Respondent's conduct in this case did not implicate the decision-making process.[5]

*Count 3.*

In Count 3 of the Complaint the Board has charged that Respondent's con-

---

4. Rule 2A of the Rules Governing Standards of Conduct of Magisterial District Judges is the same as Canon 2A of the Code of Judicial Conduct.

5. *See, In re Harrington*, 877 A.2d 570, 577–79, n. 1 (Pa.Ct.Jud.Disc.2005) where we discuss the troublesome nature of the language of Canon 2A which provides that "A Judge Should Avoid Impropriety and the Appearance of Impropriety," and "Judges ... should conduct themselves at all times in a manner that promotes confidence in the integrity and impartiality of the judiciary." This language is troublesome because it is vague and calls for subjective interpretation. The Supreme Court remedied this problem by limiting the application of that language to conduct occurring in "the decision-making process" (*In re Cicchetti*, 560 Pa. 183, 201, 743 A.2d 431, 441 (2000). In the footnote in *Harrington*) we contrast that language with Canon 2A's requirement that "Judges should comply with the law," which is not vague and does not require subjectivity in its application. However that may be, eight years and many cases later, we believe that the Supreme Court's "cure," i.e., the requirement that *any* violation of Canon 2A (or Rule 2A of the Rules Governing Standards of Conduct of Magisterial District Judges) must occur in "the decision-making process" (as it stated in *Harrington*) provides clarity and ease in understanding the reach of the Canon, guarantees consistency in its application, and, therefore, is the optimal jurisprudential solution.

duct set out in Parts A and B constitutes a violation of Article V, § 17(b) of the Pennsylvania Constitution.

In pertinent part, Article V, § 17(b) provides:

(b) Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court.

Since we have held that Respondent violated a canon of judicial ethics prescribed by the Supreme Court, *viz.*, Canon 7B(1)(c), we hold that he has violated Article V, § 17(b). This violation is automatic and derivative, *see, In re Joyce and Terrick*, 712 A.2d 834 (Pa.Ct.Jud.Disc.1998).

*Count 4.*

▮ In Count 4 of the Complaint the Board charges that Respondent's conduct set out in Parts A and B of the Complaint constitutes a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

In pertinent part that section of the Constitution provides:

A justice, judge or justice of the peace may be ... disciplined for ... conduct which ... brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.

This Court has been called upon frequently to decide whether particular conduct is such that—in the words of our Constitution—"brings the judicial office into disrepute."

The conduct in these cases has been very different—it has ranged from public drunkenness (*In re McCarthy*, 828 A.2d 25 (Pa.Ct.Jud.Disc.2003)), to sexual harassment of a courthouse employee (*In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud.Disc.1997)),

*aff'd*, 560 Pa. 183, 743 A.2d 431 (2000), to being repeatedly late for court (*In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc.2008)).

In evaluating the conduct in each and every one of these cases the Court has consistently applied certain principles and tests in our determinations that any particular conduct was—or was not—such that brings the judicial office into disrepute. In all cases where those holdings have been reviewed by our Supreme Court, those holdings have been affirmed. *See, In re Merlo*, —— Pa. ——, 58 A.3d 1 (2012); *In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255 (2007); *In re Harrington*, 587 Pa. 407, 899 A.2d 1120 (2006); *In re McCarthy*, 576 Pa. 224, 839 A.2d 182 (2003); *In re Cicchetti*, 560 Pa. 183, 743 A.2d 431 (2000).

These principles for assessing the conduct as bringing the judicial office into disrepute were first set down in this Court's opinion in *In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud.Disc.1997).

In *Smith* we first enunciated the principle that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

This Court, therefore, has, in every case, made an assessment of what it believed the reasonable expectations of the public would be as to the judicial officer's conduct involved in the particular case.

Again, in *Smith* we set down the principle, which we have consistently followed, that "the judicial officer [must have] engaged in conduct which *is so extreme*" that it brings the judicial office into disrepute. *Id.* at 1238. See cases cited *supra.*

In our opinion in *In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) we held that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

*Id.* at 312. This prescript is hardly surprising and is realistically unavoidable in determining whether particular conduct brings the judicial office into disrepute inasmuch as these cases are driven by the facts and the facts are always different.

These principles for determining whether particular conduct brings the judicial office into disrepute have been approved, indeed adopted by our Supreme Court. *See, e.g., In re Berkhimer,* 593 Pa. 366, 372–73, 930 A.2d 1255, 1258–59 (2007) and *In re Cicchetti,* 560 Pa. 183, 206–07, 743 A.2d 431, 443–44 (2000).

We believe it to be beyond dispute that a judge—or one who would be a judge—who is willing to lie—and in official documents—and repeatedly, as described in Part A of the Board Complaint (Findings of Fact Nos. 1–30)—is not one who can be expected to encourage, indeed to insist that truth be spoken in his courtroom.

In this case this Respondent's relationship with truth and his regard for its importance in his everyday professional life is gruellingly illustrated in the description of his conduct as counsel for the Appreciation Fund, a Political Action Committee (PAC) (the Fund), over a period of almost three years, beginning in January 2007 when the Fund failed to file a campaign finance report as required by law, which led to the institution of a lawsuit known as *Philadelphia Board of Ethics v. The Appreciation Fund,*[6] which led to an order holding Respondent in contempt of court for disobeying two orders of court, and which case ended in November 2009 with a Settlement Agreement between the Philadelphia Board of Ethics and Respondent. (Findings of Fact Nos. 52–86 and Bd. Ex. 24.)

On April 27, 2007 the Philadelphia Board of Ethics filed a Petition with the Common Pleas Court of Philadelphia County seeking an order compelling the Fund to file the campaign finance report requesting that the court impose the statutory fine of $1,500 for each day of violation. On June 1, 2007 the court granted that request and imposed a fine in the amount of $39,000.[7] The Fund did not pay the fine and on August 7, 2007 the Ethics Board filed a Petition for Contempt against the Fund and on September 1, 2007 the court entered an order holding the Fund in contempt and ordering it to pay the $39,000 within five days. (Findings of Fact Nos. 62–68.)

Respondent informed Ernesto DeNofa, treasurer of the Fund, of the court's September 21st order and explained that the Fund was required to pay the Ethics Board $39,000. Among other things, Respondent explicitly told DeNofa that the Fund would be required to pay the $39,000, to the extent of its assets, within five business days. (Transcript of Deposition of Thomas Nocella, dated February 5, 2009 (Nocella Tr.) 79:24–80:22 (Bd. Ex. 46)). DeNofa understood that the court had refused to reopen the judgment: "Tom [Nocella] was telling me they wouldn't reopen it so we were just trying to figure a different way, he's trying to figure a different way to handle it." (Transcript of Deposition of Ernesto De-

---

6. Respondent was later named as an additional defendant.

7. The filing was 24 days late: the filing deadline was April 4, 2007 (extended from January 31, 2007) and the report was filed on April 30, 2007.

Nofa, dated March 25, 2007 (DeNofa Tr.) 102:14–18 (Bd. Ex. 45)).

As their subsequent actions demonstrate, the "different way" that DeNofa and Respondent settled upon to handle the court's June 1st and September 21st orders was to deliberately and systematically dissipate the assets in the Fund's bank account to avoid paying the fine.

Notably, from its inception in 2003—after an initial cash infusion of $27,000 mostly through donations by then-city judicial candidates—up until December 2007 the Fund had remained essentially dormant. The Fund in 2006 made one donation, a $10,000 payment to support a PAC called "Friends of Carol Ann Campbell" in 2006, and wrote a $15,000 check to "Friends of Bob Brady" that did not clear and was never reissued by the Fund (DeNofa Tr. 70:10–14; 14:23–15:14; Nocella Tr. 105:5–106:7 (Bd. Ex. 45)).

Following the court's September 21st contempt order, however, DeNofa and Respondent initiated a flurry of activity in an effort to ensure the Fund's remaining assets were spent to pay anything other than the fine. Specifically, DeNofa and Respondent caused the Fund to make three payments after the court order, essentially depleting the Fund's assets: (a) a $13,550 payment to a catering company to satisfy a bill owed by a different PAC, "Bob Brady for Mayor"; (b) a $390 payment to a signing company to pay a bill issued to "Congressman Robert A. Brady"; and (c) a $2,500 payment to Respondent himself.

On December 1, 2007, the Fund had $16,919.17 in its PNC bank account. (See Appreciation Fund Bank Statement for December 2007 (Bd. Ex. 34)). By March 31, 2008, as a direct result of DeNofa's and Respondent's scheme to circumvent the court's orders, the Fund's assets had been almost entirely used up, leaving only $378.77 in the Fund's account. (See Ap-preciation Fund Bank Statement for March 2008 (Bd. Ex. 36)).

On May 15, 2007, the PAC called "Bob Brady for Mayor" held an event catered by Penns Landing Caterers (the Catering Company) resulting in a $17,120 invoice. In October 2007, Carol Ann Campbell, Secretary of Philadelphia's Democratic City Committee, asked Respondent to attempt to negotiate a reduction of the bill with the Catering Company. (Nocella Tr. 119:3–5 (Pet. Ex. 9)). Respondent negotiated a reduction from $17,120 to $13,535. (Id. at 151:2–6 and see Penns Landing Caterers Invoice (Bd. Ex. 27)).

At or around this time, DeNofa, aware of the court's orders and, as treasurer and sole officer of the Fund aware of the limited funds remaining in the Fund's bank account, asked Respondent "to see what we could do about paying some—some unpaid bills." (DeNofa Tr. 15:9–24; 90:19–91:16; 102:1–18 (Bd. Ex. 45)). In early December 2007, Respondent—aware of the court's orders and aware that there was only $15,000 or $16,000 in the Fund's bank account (Nocella Tr. 137:5–17 (Bd. Ex. 46))—approached DeNofa and suggested that the Fund pay Bob Brady for Mayor's catering bill. (Id. at 135:8–20–136:1).

In deciding whether to use Fund proceeds to pay the catering bill of Bob Brady for Mayor, DeNofa and Respondent discussed the fact that the court's June 1st order and September 21st contempt order required payment of $39,000 to the Ethics Board. (Id. at 80:15–81:1; DeNofa Tr. 90:19–91:16 (Bd. Ex. 45)). DeNofa recalled the $15,000 check the Fund had written to support "Friends of Bob Brady" that had been returned by the bank in 2006 and never reissued; DeNofa asked Respondent what he thought of the argument that that check could be considered a "prior obligation" to Bob Brady, generally,

i.e. a debt pre-existing the court's orders, justifying which could be put forth as payment of the catering bill of "Bob Brady for Mayor." (Nocella Tr. 104:7–105:16 (Bd. Ex. 46)).

Respondent knew that the returned $15,000 check to "Friends of Bob Brady" did not create any legally binding debt (much less to Bob Brady personally or to "Bob Brady for Mayor") and that the court's June 1st order and September 21st contempt orders took priority over any such payment. (*Id.* at 126:5–15; 131:23–132:6). Respondent also advised DeNofa that the "prior obligation" was just "[De-Nofa's] personal feeling that there was an obligation. The primary obligation was the $39,000." (*Id.* at 104:14–18). He also explained to DeNofa that the argument was not strong, that he did not agree with it, and that it was not likely to succeed under the law if presented to a court. (*Id.* at 105:13, 130:11–22). Nonetheless, Respondent and DeNofa agreed that DeNofa could pay the Catering Company bill "in anticipation of believing"—if and when the payment was challenged—that he had a prior obligation and that there was a legal basis for it. (ML at 105:7–12). On that basis, DeNofa was satisfied he would have an excuse if needed:

> The argument is that you presented the check. Once you present a check to somebody, again, whether it's a gift or whether it's—he completed the gift. Now the check is bad. He still owes that person $15,000. That is an argument. It's not the greatest in the world but it's something. And based on that, [DeNofa] was satisfied.

(*Id.* at 129:22–130:10).

On December 7, 2007 DeNofa signed a Fund check to the Catering Company for $13,550. On December 11, 2007, Respondent personally picked this check up and personally hand-delivered the check to the Catering Company at the company's office. (Nocella Tr. 152:7–18; 155:4–6, 156:16–23 (Bd. Ex. 46)).

DeNofa and Respondent were the two individuals responsible for causing the Fund to make this payment. DeNofa, as the treasurer and sole officer of the Fund, was the only person authorized to make the payment. (DeNofa Tr. 104:10–13 (Bd. Ex. 45)). As DeNofa explained, he and Respondent "came up with" the idea (*id.* at 15:9–17); he and Respondent were the only people involved in the decision to make the payment (*id.* at 15:20–24); and he did not speak about the payment to the Catering Company with Carol Ann Campbell or anyone other than Respondent (*id.* at 52:19–24).

Respondent, for his part, also eventually acknowledged that he introduced the idea of paying Bob Brady for Mayor's catering bill to DeNofa. (Nocella Tr. 135:21–136:1 (Bd. Ex. 46)). Notably, during approximately the first hour of his deposition, Respondent affirmatively misrepresented this fact and asserted that Carol Ann Campbell, who was recently deceased, had introduced the idea of paying the catering bill to DeNofa, had persuaded DeNofa that the returned $15,000 check took priority over the court's orders, and had discussed the catering bill payment with DeNofa. (*Id.* at 99:11–100:3; 110:12–24; 133:9–18). Only after being confronted with DeNofa's contrary sworn statements, did Respondent acknowledge that he did not actually know if Campbell and DeNofa had ever even spoken about the catering bill, and that he (Respondent) was the one who brought the idea to DeNofa at Carol Ann Campbell's suggestion. (*Id.* at 133:22–136:22).

Unaware of DeNofa's and Respondent's ongoing scheme to evade the order and dissipate the Fund's assets on December 12, 2007, the Ethics Board's counsel sent

to Respondent the Ethics Board's initial discovery requests in aid of execution on the judgment. (See Tarringer Decl. para. 5 (Bd. Ex. 49)). These discovery requests, which included interrogatories and document requests, were focused specifically on trying to discover information regarding the Fund's assets to effectuate the payment of the $39,000 judgment the court had levied against the Fund. (*Id.*) The Fund was required to respond to these discovery requests within 30 days. The Fund failed to respond by that date.

On January 21, 2008, ten days after the response to the Ethics Board's discovery request was due, the Fund still had not responded, and the Ethics Board's counsel, Michael Tarringer, called Respondent, who confirmed that he would respond to the discovery requests by the end of the next week. (See Tarringer Decl. para. 6 (Bd. Ex. 49)). The same day, Mr. Tarringer arranged for hand-delivery of a letter to Respondent memorializing this conversation. (Tarringer Decl. para. 6 (Bd. Ex. 49)).

Shortly after speaking to the Ethics Board's counsel about the Ethics Board's outstanding discovery requests, DeNofa and Respondent caused the Fund to make another payment—this time for $390 to satisfy a sign language translation invoice issued to "Congressman Robert A. Brady." In January 2008, DeNofa discussed the issue with Respondent and decided to further dissipate the Fund's remaining assets by paying Representative Brady's bill with Creative Access. As DeNofa explained, "I made the decision; I talked to Tom Nocella about it and thought it was a good idea and that's what we did." (DeNofa Tr. 19:24–20:3 (Bd. Ex. 45)).

For his part, Respondent drafted a cover letter for his signature under his letterhead, signed the letter, obtained the check, and personally mailed the check to Crea-

tive Access. (Nocella Tr. 177:13–179:11 (Bd. Ex. 46)). Demonstrating his flagrant disregard for the court's orders, Respondent mailed this letter the very day after speaking with the Ethics Board's counsel and assuring counsel that he would provide the Fund's overdue responses to the Ethics Board's discovery requests in aid of execution of judgment, (Tarringer Decl. para. 6 (Bd. Ex. 49)).

By February 5, 2008, Respondent still had not produced any discovery. On that day, therefore, the Ethics Board's counsel called Respondent and left him a voicemail indicating he wished to discuss the matter with Respondent. The Ethics Board's counsel also sent Respondent an email to that effect. (See Tarringer Decl. para. 7 (Bd. Ext. 49)). Rather than producing discovery or responding to the Ethics Board's counsel, on or about that same day, Respondent and DeNofa decided to drain what little remained in the Fund's bank account, by issuing a check to Respondent himself.

From the outset of his engagement, Respondent was clear that his services would be rendered on a pro bono basis. (Nocella Tr. 16:6–17:6 (Bd. Ex. 46)). Indeed, as of February 2008, Respondent had represented the Fund and DeNofa on a pro bono basis, was continuing to represent them on a pro bono basis, and had no expectation of payment going forward. (*Id.* at 203:13–23). In early February 2008, however, DeNofa and Respondent agreed that, rather than pay even the little remaining in the Fund's bank account towards the court-ordered fine, Respondent himself would appropriate those assets and would do so on the pretext of payment for legal service. Knowing there was initially $15,000–$ 16,000 in the Fund's bank account and having personally arranged delivery of the checks to the Catering Company and Creative Access, Respondent knew at that point

that only a couple thousand dollars remained in the bank account. (*Id.* at 137:5–17; 202:7–13). He therefore proposed that DeNofa write him a check from the Fund for $2,500 and DeNofa agreed. (*Id.*) According to Respondent, "Mr. DeNofa asked if I wanted a fee. I said yes. He asked how much. I said $2,500. That's how it happened." (*Id.* at 198:5–13). In furtherance of their scheme to evade the court's orders, Respondent then created an invoice dated February 5, 2008, purporting to charge the Fund $2,500 for "legal services." (Nocella Tr. 196:8–16 (Bd. Ex. 46)). DeNofa made out a check, dated March 17, 2008, to Respondent, and Respondent cashed the check on or about March 27, 2008. (See Appreciation Fund Bank Statement for March 2008 (Bd. Ex. 36)).

At the time DeNofa and Respondent agreed to deplete the Fund's assets on the pretext of legal services, both were well aware that the court's September 21st contempt order required the Fund to pay $39,000 within five business days of September 21, 2007, that their prior actions had dissipated all but a couple thousand dollars from the Fund's bank account, and that no legal fees in fact were owed to Respondent because he was representing the Appreciation Fund pro bono.

Respondent, when confronted with these facts, was unrepentant:

Q. When Mr., Nocella made that proposal to you, were you aware that the Board of Ethics had just issued to you discovery in aid of execution of the outstanding judgment of Judge DiVito dating back to September of 2007?

A. Yes.

Q. And you knew that the judgment had not been paid, even a dime of it?

A. I knew the judgment wasn't paid.

* * *

Q. Why did you invoice the Fund and cash the check when you were aware that the funds that remained in the Appreciation Fund's bank account were subject to Judge DiVito's Order and Judgment from September of 2007 to pay the fine within five days of the Order?

A. Because I thought it was proper to have a legal fee paid out of whatever funds were remaining.

* * *

Q. Did you consider the legality or ethics of draining the last couple thousand dollars from the Appreciation Fund bank account?

A. Yes.

Q. And can you share with us that analysis?

A. I thought it was agreeable to pay an attorney's fee. I thought there was no problem with an attorney's fee. That was my belief at the time and it still is.

* * *

Q. And until [DeNofa] made that suggestion to you, you were continuing to perform services in the matter pro bono, correct?

A. Yes.

Q. And until he made that suggestion, you didn't have an expectation of being paid for your services representing the Appreciation Fund or Mr. DeNofa?

A. Yes.

(Nocella Tr. 198:21–203:23 (Bd. Ex. 46)).

As of March 31, 2008, by paying the three "invoices" (none of which were a legal obligation of the Fund) DeNofa and Respondent had reduced the Fund's assets to $378.77. (See Appreciation Fund Bank Statement for March 2008 (Bd. Ex. 36)).

While draining the Fund's assets, Respondent engaged in a pattern of delay and deceit to prevent the Ethics Board from gaining information about the Fund's assets.

On February 6, 2008—the day after Respondent created the $2,500 legal invoice to document the payment to himself—Respondent and the Ethics Board's counsel spoke on the phone. On this call, Respondent informed the Ethics Board's counsel that the Fund was "dormant" and had "no assets." (Tarringer Decl. para. 8 (Bd. Ex. 49)). (See also Krause Decl. para. 7 (Bd. Ex. 50)). These representations were misrepresentations. In fact, as Respondent well knew, the Fund was not "dormant"; Respondent himself had recently arranged payment of $13,550 to the Catering Company and $390 to Creative Access. Nor did the Fund have "no assets." Only one day earlier, Respondent had issued an invoice for himself to receive $2,500, and he knew at that time that at least that amount remained in the Fund's bank account.

On February 7, 2008, when the Fund still had not produced any discovery responses, the Ethics Board's counsel called Respondent, leaving a message with his assistant. (See Tarringer Decl. para. 9 (Bd. Ex. 49)). Later that day, the Ethics Board's counsel emailed Respondent, informing him that he had left the message and asking Respondent to contact him about this case. (Id.) Respondent did not respond.

Having received no response from Respondent by February 12, 2008, the Ethics Board's outside counsel Cheryl Krause, reached Respondent by telephone. In that conversation, Respondent informed Ms. Krause that—although the discovery responses were 30 days overdue and Respondent had advised Mr. Tarringer on January 21, 2008 that he would respond by the end of the next week—he had not even

communicated the discovery requests to DeNofa and the Fund and that he did not have possession of any of the Fund's documents. Ms. Krause told him that the Ethics Board was prepared to seek court intervention if he did not promptly respond to the Ethics Board's discovery requests, and Respondent assured Ms. Krause he would attempt to reach his client and obtain responses by February 13, 2008. (See Krause Decl. para. 5–6 (Bd. Ex. 50)).

On February 13, 2008, Respondent left a voicemail for Mr. Tarringer stating that he was in the process of having the Fund's response to the Ethics Board's discovery requested typed up and that he now possessed the documents the Ethics Board had requested from the Fund. (See Tarringer Decl. para. 10 (Bd. Ex, 49)).

Also on February 13, 2008, Respondent again spoke with Ms. Krause. In this call, Respondent requested to Ms. Krause that the Fund had nothing of significance left in its bank account and had no real or tangible assets other than its bank account. (See Krause Decl. para. 6 (Bd. Ex. 50)). Also, in this conversation or another within the same few days, Respondent advised Ms. Krause that at most a few hundred dollars remained in the Fund's bank account. (Id.) These statements were plainly untrue. Respondent, having issued himself an invoice to receive the $2,500 the prior week and having not yet cashed that check, knew on February 13th that at least $2,500 remained in the Fund's bank account. Indeed, Respondent did not withdraw those proceeds from the Fund's account until he cashed the check on or about March 27, 2008. (See Appreciation Fund Bank Statement for March 2008 (Bd. Ex. 36)).

In the February 13th call, Respondent also informed Ms. Krause that he had in his possession the Fund's bank records from January 1, 2007 to the present (docu-

ments that were responsive to the Ethics Board's document requests) and was dictating the responses to the Ethics Board's interrogatories. Respondent assured Ms. Krause he would send both items by the end of the day. However, he did not do so. (Krause Deck para. 6 (Bd. Ex. 50)).

On February 14, 2008, the Ethics Board had still not received a response to its discovery request. Ms. Krause wrote a letter to Respondent, sending it to him by facsimile and by first-class mail. In this letter, Ms. Krause noted Respondent's series of excuses and delays in producing discovery, confirmed Respondent's representation that the Fund had "no assets," and notified Respondent that the Ethics Board would file a motion to compel if the Fund did not respond to the Ethics Board's discovery requests by February 15, 2008. (See Krause Deck para. 7 (Bd. Ex. 50)). Respondent did not respond to this letter. Notably, Respondent testified that he would have responded had he disagreed with the assertions made in the letter. (Nocella Tr. 210:3–8 (Bd. Ex. 46)).

On February 15, 2008, Respondent finally faxed the Ethics Board's outside counsel an initial response to the Ethics Board's discovery requests. (See Krause Deck para. 8 (Bd. Ex. 50)). On February 20, 2008, Respondent faxed the Ethics Board's outside counsel copies of certain of the Fund's bank records. (Id. at para. 9). These documents revealed that—far from being dormant—the Fund had dissipated over $13,900 in the months after the court's September 21st contempt order.

On March 25, 2008, the Ethics Board's outside counsel deposed DeNofa. During his deposition, DeNofa made clear that he had no intention of ever complying with the court's orders:

Q. What does the Fund plan on doing with (the remaining assets in its bank account)?

A. Well, maybe we'll write it to—my daughter has a charity so [sic] she belongs to—and I have a cousin that's on another charity for autism. I was thinking maybe, you know, writing a check and closing the account.

(DeNofa Tr. 75:11–19 (Bd. Ex. 45)).

On July 2, 2008, the Ethics Board noticed the deposition of Respondent. Respondent refused to attend, claiming blanket attorney-client privilege despite the facts that DeNofa, in his own deposition, had waived privilege on numerous conversations with Respondent and that Respondent's deposition would cover communications that could not conceivably be privileged, including Respondent's conversations with the Catering Company. (Krause Decl. para. 11 (Bd. Ex. 50)).

On September 11, 2008, due to Respondent's intransigence, the Ethics Board was forced to file a motion to compel, describing the facts known to that point of Respondent's personal involvement in the dissipation of Fund assets, including his negotiations and payment of the Catering Company invoice. (Id. at para. 12). On December 2, 2008, while this motion was pending before the court, Respondent was appointed a Municipal Court judge.

On January 20, 2009, the court granted the Ethics Board's motion and ordered Respondent to submit to a deposition. (Krause Decl. para. 13 (Bd. Ex. 50)). On February 5, 2009, after almost a year and a half of deliberate delay, obfuscation, and deceit, Respondent was finally deposed by the Ethics Board's counsel and the true nature and extent of DeNofa's and Respondent's conduct became apparent.

After Respondent's deposition, on March 11, 2009, the Ethics Board named Respondent and DeNofa as additional defendants in its suit against the Appreciation Fund

and filed a Petition for Contempt against Respondent and DeNofa. On September 9, 2009, the Court of Common Pleas of Philadelphia County granted the Petition and issued an order that, among other things, held Ernesto DeNofa and Thomas Nocella in contempt of the Court's June 1, 2007 order and September 21, 2007 order, and directed them, jointly and severally, to pay the Board a civil penalty in the amount of $39,000 within 30 days from the docketing of the order. (See Order, Bd. Ex. 23 and Settlement Agreement, Bd. Ex. 24).

On November 17, 2009 Respondent and DeNofa entered into the Settlement Agreement wherein they agreed to pay $16,440 to the Ethics Board. (See Settlement Agreement, p. 4, para. 6, Bd. Ex. 24).

In this case, both the truth and the authority of the court went unrecognized by Respondent, so blatantly that he was held to be in contempt of the authority of that court.

We find that Respondent's conduct was so extreme that it brings the judicial office itself into disrepute, and also that the reasonable expectations of the public as to the behavior of judicial officers do not include the conduct of this Respondent described above.

*Legal Issues.*

Respondent argues that there are two reasons which require this Court to dismiss the Board's Complaint.

■ He says the Board's Complaint should be dismissed because this Court lacks jurisdiction.

When asked to identify the basis for that position Respondent says that some of the offending conduct took place when he was a lawyer. Of course, that means that some of the offending conduct took place when he was a judge, or a candidate for judge; and of course, Respondent doesn't contend that this Court lacks jurisdiction over that conduct, which includes, we mention, for example, all the false questionnaires, which Respondent submitted when he was a judge or a candidate for judge or both.[8] Next, we are at a loss to understand where Respondent got the idea that this Court had no jurisdiction over a judge's conduct while he was a lawyer. One need look no further than the Constitution to learn how mistaken that idea is. In Article V, § 17(b) of the Pennsylvania Constitution it is provided:

Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of *legal or* judicial ethics prescribed by the Supreme Court. (Emphasis added.)

In the case of *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) this Court dealt specifically with Section 17(b) of the Constitution and the jurisdiction of this Court and the Judicial Conduct Board over the conduct of a judge when he was a lawyer. There we said:

... we interpret the language of Section 17(b) to permit the Board to investigate charges of misconduct against a judicial officer which took place while he or she was a lawyer prior to his or her elevation to the bench. *See, e.g., In re Greenberg,* 442 Pa. 411, 280 A.2d 370 (1971).[9]

*In re Cicchetti, supra* at 318.

We hold this Court has jurisdiction over all of the Respondent's conduct set out in the Board's Complaint.

8. Not to mention Respondent's conduct in connection with his dissipation of the assets of the Appreciation Fund in defiance of two orders of court, which conduct took place after December 2, 2008 when he was appointed judge and continued until November 17, 2009 when the case was settled.

9. In *Greenberg* the offending conduct took place when Greenberg was a lawyer, before he became a judge.

 The other reason Respondent advances as requiring dismissal of the Complaint is that this Court is "collaterally estopped" from finding Respondent subject to discipline under the Pennsylvania Constitution for the conduct set forth in the Board's Complaint in Part B and in Findings of Fact Nos. 52–86, i.e., his conduct in connection with the Appreciation Fund which culminated with the entry of the order of contempt against Respondent. He designates the estopping event as the "determination" of the Disciplinary Board of the Supreme Court of Pennsylvania of December 17, 2010 that certain conduct of Respondent had earned him "an informal admonition as the disciplinary action ... against you for the following violations found:

> 1. RPC 4.1(a) and RPC 8.4(c)—in February 2008 you had separate telephone conversations with Michael Tarringer, Esquire, and Cheryl A. Krause, Esquire, counsel for the Philadelphia Board of Ethics ("the Ethics Board"), during which conversations you misrepresented to Mr. Tarringer and Ms. Krause that The Appreciation Fund ("the Fund") had no assets.
>
> 2. RPC 8.4(a) and RPC 8.4(d)—in that you assisted Mr. Ernesto DeNofa in violating the June 1, 2007 and September 21, 2007 Orders issued by the Honorable Gary DiVito, which Orders required the Fund to pay the Ethics Board $39,000.00."

Initially Respondent lumped his jurisdiction argument with what he was then calling "Res Judicata." (See Respondent's Brief Pursuant to the Order dated January 2, 2013, Section 1. which begins with the heading: "Jurisdictional and Res Judicata Issues.") Respondent simply does not have a jurisdictional issue,[10] so it appears that these two issues have morphed into what Respondent now calls "collateral estoppel."

Our sense is that Respondent's problem with this process is his disaffection with the idea that the Judicial Conduct Board has investigated and charged and the Court of Judicial Discipline is reviewing, with an eye towards possible discipline, conduct, some of which is the same as conduct for which he has already been disciplined by the Disciplinary Board. The problem is this problem is not going to go away. There are many reasons for this.

– One reason is the Supreme Court of Pennsylvania had held, in *Office of Disciplinary Counsel v. Jepsen*, 567 Pa. 459, 787 A.2d 420 (2002):

> Contrary to the arguments in favor of exclusive authority in either the Disciplinary Board or the Court of Judicial Discipline, we hold that both entities possess constitutionally conferred authority to entertain charges filed against a judicial officer who commits misconduct during the practice of law. Each tribunal is likewise capable of determining the appropriate discipline.

---

**10.** On more than one occasion the Supreme Court has pointed out that in cases involving attorney or judicial discipline the terms "jurisdiction" and "power" ("authority") are used interchangeably which is confusing and unhelpful, and has quoted from its opinion in *Riedel v. Human Relations Commission of the City of Reading*, 559 Pa. 34, 739 A.2d 121 (1999), to explain the difference: "[j]urisdiction relates solely to the competency of the particular court or administrative body to determine controversies of the general class to which the case then presented for *its* consideration belongs. Power, on the other hand, means the ability of a decision-making body to order or effect a certain result." *In re Melograne*, 571 Pa. 490, 495, 812 A.2d 1164, 1167 (2002). *See, also, Office of Disciplinary Counsel v. Jepsen*, 567 Pa. 459, 464, 787 A.2d 420, 423 (2002).

*Id.* at 464, 787 A.2d at 423. We think that suffices to settle the matter; but we will mention a few other reasons:·

– Another reason is that if collateral estoppel were to be found to be appropriate in this case it would operate to bind this Court to find *against* Respondent. This is elementary because the *Disciplinary Board found against Respondent.* A ruling here *in favor* of Respondent would be directly in opposition to the ruling of the Disciplinary Board: the decisions would be inconsistent—this is one of the things the doctrine of collateral estoppel is designed *to prevent.*[11]

– Another reason is that the Supreme Court has clearly established when the doctrine of collateral estoppel may be employed. *In Kiesewetter,* the court said:

> The doctrine of collateral estoppel can be asserted either defensively as a shield to prosecution of an action or ·offensively as a sword to facilitate prosecution. Offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use of collateral estoppel occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant. In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action. (Citations omitted).

*Id.* at 484–85, 889 A.2d at 51.

In this case Respondent attempted use of the doctrine is defensive and it is clear that the use is not authorized here because the plaintiff here (the Judicial Conduct Board) is not "asserting a claim [it] has previously litigated and lost." The Judicial Conduct Board has not previously litigated anything having to do with this Respondent, nor did it "lose" in any relevant previous litigation. The only previous litigation here was the proceeding before the Disciplinary Board—which *Respondent* lost.

– Another reason is that our Supreme Court has set down five conditions, all of which must be met, in order to permit the doctrine of collateral estoppel to come into play. Those conditions are:

> The doctrine of collateral estoppel precludes relitigation of an issue determined in a previous action if: (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. (Citations omitted).

*Id.* at 484, 889 A.2d at 50–51.

One-by-one we will examine this case to see if the five conditions have been met by Respondent.

1. The issue in the prior case is not identical to the issue here. The issue in the first case was whether Respondent's conduct was inimical to his privilege to practice law; here the issue is whether

---

**11.** *See, Office of Disciplinary Counsel v. Kiesewetter,* 585 Pa. 477, 484, 889 A.2d 47, 51 (2005) where the Supreme Court said: "Collateral estoppel relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication."

Respondent's conduct was inimical to his service as a judge. Condition not met.

2. There was a final adjudication on the merits. There was.[12] Condition met though contrary to the interests of Respondent.

3. The party against whom the plea is asserted (here the Judicial Conduct Board) must have been a party or in privity with a party in the prior case. The Judicial Conduct Board was not a party nor is it in privity with any party in the prior case. Condition not met.

4. The party or person privy to the party against whom the doctrine is asserted (here the Judicial Conduct Board) must have had a full opportunity to litigate the issue in the prior proceeding. The Judicial Conduct Board had no opportunity to litigate the issue here in the prior proceeding. Condition not met.

5. The determination in the prior proceeding was essential to the judgment in that proceeding. Condition met.

We hold that the doctrine of collateral estoppel is not applicable to the claims asserted by the Judicial Conduct Board against Respondent.

## IV. CONCLUSIONS OF LAW

1. Respondent's conduct set out in Findings of Fact Nos. 1–51 is:

(a) a violation of Rule 7B($l$)(c) of the Rules Governing Standards of Conduct of Magisterial District Judges,

(b) a violation of Article V, § 17(b) of the Pennsylvania Constitution, and

(c) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

2. Respondent's conduct set out in Findings of Fact Nos. 52–86 is:

(a) a violation of Article V, § 17(b) of the Pennsylvania Constitution, and

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1).

3. Respondent's conduct set out in Findings of Fact Nos. 52–86 is not a violation of Canon 2A of the Code of Judicial Conduct.

4. Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## ORDER

AND NOW, this 5th day of August, 2013, the Findings of Fact and Conclusions of Law set forth in this Court's Opinion dated June 26, 2013 having become final pursuant to C.J.D.R.P. No. 503, and after a hearing before the full Court on July 29, 2013 on the question of sanctions, it is hereby ORDERED that Respondent, Thomas M. Nocella, Judge of the Court of Common Pleas of Philadelphia County, is removed from office and shall be ineligible to hold judicial office in the Commonwealth of Pennsylvania in the future.

President Judge McGinley dissents from the Sanction Order entered by the majority of the Court and would suspend Respondent from his judicial office for four months with half pay and place him on probation thereafter until his retirement.

Judge McCune did not participate in the determination and entry of this Sanction Order.

---

12. But it was against Respondent, as noted above.